UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Northbrook Digital LLC,

      Plaintiff,

v.

Vendio Services, Inc.,

      Defendant.

Civil No. 07-2250 (PJS/JJG)

REPORT
AND
RECOMMENDATION

---

JEANNE J. GRAHAM, United States Magistrate Judge

      This matter came to the undersigned on March 6, 2008 on defendant Vendio Services' motion to dismiss or in the alternative to transfer venue (Doc. No. 24) and its application for a protective order (Doc. No. 34); and on plaintiff Northbrook Digital's motion to amend its complaint (Doc. No. 35).  Peter M. Lancaster, Esq., appeared on behalf of Northbrook Digital (Northbrook).  Rita E. Tautkus, Esq., and Felicia M. Boyd, Esq., appeared on behalf of Vendio Services (Vendio).  The motion to dismiss was referred for a report and recommendation in accordance with 28 U.S.C. § 636 and Local Rule 72.1(b).

## I.    BACKGROUND

      In this patent infringement litigation, Vendio moves to dismiss for lack of personal jurisdiction, or in the alternative, that venue be transferred to the Northern District of California. It separately brings a motion for a protective order, asking that its confidential information be protected from disclosure to Mark A. Wolfe, Esq., who is evidently both the sole stakeholder in Northbrook and one of its attorneys of record here.

Northbrook brings its own motion to amend its complaint.  Opposing this motion, Vendio renews the jurisdictional arguments from its motion to dismiss, and thus contends that the motion to amend is futile.  As Vendio does not raise any other arguments against Northbrook's motion to amend, the outcome of this motion to amend accordingly depends on the ruling for the motion to dismiss.  The motion to amend, therefore, is properly considered in this report.

In brief, the patents-in-suit teach methods for search and retrieval of data over computer networks such as the internet.  Vendio developed and distributed software, called Dealio, which allegedly includes a search feature that infringes these patents.

Dealio software is a toolbar application that operates in conjunction with web browsing software.  (Exh. 1.)[1]  While a user is browsing the internet, Dealio software downloads links to the toolbar from Vendio's servers.  (*See* Exh. 1; Exh. 2 at 2.)  The links advertise bargains from merchants.  If a user clicks on a link, the web browser navigates to a page on the merchant's website, where the user may buy directly from that merchant.  (*See* Exh. 1; Exh. 3 at 2; Exh. 4 at 3.)  And Dealio software includes the accused search feature, allowing a user to search for bargains online.[2]  (*See* Exh. 1.)

For links or searches on Dealio software to function, there must be a connection via the internet between the user's computer and Vendio's servers.  (Exh. 2 at 2.)  The links shown on Dealio software are typically refreshed once every fifteen minutes, based on a signal or "ping" that Dealio software transmits to Vendio's servers.  (*See* Exh. 1; Exh. 2 at 2; Exh. 5 at 4.)  All users of Dealio software receive the same links; the offers linked on Dealio  software are not

---

[1] Exhibits are cited in an appendix at the end of this report and recommendation.

[2] Around the time this litigation commenced, Vendio purportedly removed the accused search feature from Dealio software.  This development, however, is not material to the questions presented here.

customized from data received from users, except for when the search feature is used. (*See* Exh. 5 at 4.)

Dealio software is available for free download from Vendio's website. In order to use Dealio software, the user must register online and then activate the software on the user's computer. (Exh. 2 at 2.) To register, the user need only provide a username, a password, and an e-mail address. Vendio thus does not request information about the physical location of Dealio software users. (*See* Exh. 1; Exh. 2 at 2.)

One key factual dispute in this matter is whether Dealio software users are located in Minnesota. As there is no direct information from users regarding their location, the parties have looked at other ways to answer this question. One is premised on the assumption that, of downloads within the United States, a certain proportion is likely to be from Minnesota. Because recent census data indicates that 1.7% of the United States' population are residents of Minnesota, and because about 225,000 domestic users have downloaded Dealio software, it may be estimated that about 3,800 users of Dealio software are residents of Minnesota. (Exh. 2 at 3; Exh. 5 at 3; Exh. 6 at 21, 29.)

Another method is to track the physical location of users by looking at their IP addresses. From IP addresses that Vendio received when Dealio software users activated the search feature, Vendio determined that 389 residents of Minnesota used Dealio software over a two-month period.[3] (*See* Exh. 5 at 4; Exh. 6 at 29; Exh. 7.) From this figure, it may be estimated that 2,300

---

[3] There are several reasons that this figure provides, at best, an incomplete indication of actual usage of Dealio software in Minnesota. One is that Vendio evidently counted only those users who engaged the search feature, rather than all users who were actively receiving links. The record also fails to mention whether each user is unique or whether single users may have been counted more than once. And there is a suggestion that Dealio software selected a two-month period with lighter traffic than normal. (*See* Exh. 6 at 24-25; Exh. 7.) Even with these caveats,

Minnesota residents have used Dealio software in a year.  And when this figure is compared with the previous estimate of downloads, it is reasonable to infer that Minnesota users of Dealio software number in the thousands, or at least are on that order of magnitude.

Aside from usage of Dealio software itself, the parties raise some additional questions about the revenues that Vendio earns from the software.  Because the software is available for free, Vendio does not directly generate cash from its users.  The record implies that in certain circumstances, when a user activates the search feature—and then presumably purchases something—Vendio is directly paid a fee or commission.  According to Vendio, it earned $700 in a two-month period as a result of such activity by Minnesota users.  (Exh. 8.)

This revenue, however, is apparently only part of the revenue that Vendio earns from Dealio software.  Another source is derived from advertising by merchants whose links are displayed through Dealio software.  A complicated series of transactions controls how this advertising is generated and how Vendio ultimately collects advertising-related revenues.

Vendio does not directly acquire advertising from merchants.  The merchants instead give the right to distribute such advertisements to brokers, which the record opaquely refers to as "affiliate program administrators."  These administrators evidently offer portfolios of advertising to websites or shopping utilities that display the links.  No money changes hands, however, until a user clicks through a link and buys something from the merchant.  After the sale, the merchant pays a commission to the affiliate program administrator, which in turn pays a share to the entity that actually displayed the link.  (*See* Exh. 3 at 2, 5; Exh. 4 at 2-3; Exh. 6 at 11-12, 21.)

The record indicates that Dealio software displayed links from two major retailers whose principal place of business is in Minnesota, among other large retailers with nationwide

---

however, this information is enough to give some reliable indication about the extent to which Dealio software is used in Minnesota.

operations.   These retailers have made their links available for distribution through affiliate program administrators whose operations are based in New York and California.  So when users of Dealio software click through links and buy from Minnesota merchants, Vendio receives its commission from New York and California rather than from Minnesota.  (*See* Exh. 6 at 11-12, 21.)

The record does not meaningfully explain how these revenues, or similar commissions earned from other affiliate program administrators, may be connected to Minnesota.  But Vendio contends that in 2007, its *total* revenue from Dealio software was $135,000.  (Exh. 5 at 3.)  It may be inferred that this figure includes earnings for both the search feature activity and for advertising commissions.  And as noted earlier, only a tiny fraction of Dealio software users are Minnesota residents.  From the small amount Vendio collected due to their search feature activity, it is reasonable to infer that a similarly small amount of advertising commissions can be connected to Minnesota users.

Northbrook counters that Vendio has at least $300,000 in revenues, in 2007, which may be traced to customers in Minnesota.  There is no reason to doubt that this figure is correct.  (*See* Exh. 9.)  But this accounting does not itemize what part of the revenues, if any, can be attributed to Dealio software as opposed to Vendio's other business operations.

II.     **ANALYSIS**

A.     **Personal Jurisdiction**

The initial question here is whether it is appropriate to exercise personal jurisdiction over Vendio.  When examining personal jurisdiction in patent litigation, the law of the Federal Circuit applies. *3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1376 (Fed. Cir. 1998).

### 1.    Standard of Review

Although the parties have not specified the standard of review in this context, it merits discussion here.  According to case law from the Federal Circuit, the standard of review depends on whether the parties have conducted jurisdictional discovery and whether a party has requested an evidentiary hearing.

As a general rule, where there is no jurisdictional discovery, the plaintiff need only make out prima facie evidence for personal jurisdiction, meaning that factual conflicts in the record are resolved in the plaintiff's favor.  *See Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1282-83 (Fed. Cir. 2005); *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1201 (Fed. Cir. 2003).

The prima facie standard still controls when the parties provide documentary evidence beyond the allegations in the complaint.  *Electronics for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348-49 (Fed. Cir. 2003).   But where jurisdictional discovery is complete and the parties advise that no evidentiary hearing is necessary, the plaintiff is put to proof and must show personal jurisdiction by a preponderance of the evidence.  *Pieczenik v. Dyax Corp.*, 265 F.3d 1329, 1334 (Fed. Cir. 2001).

Northbrook has undertaken some jurisdictional discovery he re, including limited time for deposition that this Court authorized by an order on January 18, 2008.  Relying on information from this discovery, Northbrook argues there is personal jurisdiction over Vendio here.  Neither party represents that jurisdictional discovery is complete, however, or advises that an evidentiary hearing is needed.  Without further guidance from the parties, this Court concludes that the prima facie standard applies to the current motion.

2.      **General Principles**

A federal court cannot exercise jurisdiction over a nonresident defendant unless it has personal jurisdiction over that defendant.  Two components are essential to personal jurisdiction: whether service may be accomplished under the long-arm statute of the forum state, and whether exercise of such authority comports with due process.  *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006).

As Minnesota's long-arm statute generally permits personal jurisdiction to the extent allowed by due process, these components merge and only the limits of due process are germane here.  *See* Minn. Stat. § 543.19;  *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1359-60 (Fed. Cir. 2001); *Guinness Import Co. v. Mark VII Distributors, Inc.*, 153 F.3d 607, 614 (8th Cir. 1998).

To decide whether personal jurisdiction comports with due process, a court must evaluate whether the defendant has sufficient contacts with the forum state.  There are two theories for determining the sufficiency of such contacts:  general personal jurisdiction and specific personal jurisdiction.  Each requires independent discussion here.[4]

3.      **General Personal Jurisdiction**

Under the theory of general personal jurisdiction, the inquiry is whether the defendant has continuous and systematic contacts with the forum state.  *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 416-18 (1984).

It is not enough for the defendant to sell or distribute its products or services in the forum state, even where revenues from that activity are substantial.  *See id.* at 416-18 (concluding that, where a helicopter servicing company earned over $4 million in seven years' activity in forum

---

[4] At the motion hearing, Vendio claimed that Northbrook was chiefly relying on the theory of general personal jurisdiction.  Northbrook denied this characterization and countered that it was advancing specific personal jurisdiction as well, a position that is borne out by Northbrook's papers.  This Court accordingly considers both theories here.

state, contacts were not sufficient to establish general personal jurisdiction).  There must also be extensive facilities for service or distribution within the forum state, which ordinarily consist of substantial premises or operations there.  *See LSI Indus. Inc. v. Hubbell Lighting*, 232 F.3d 1369, 1375 (Fed. Cir. 2000) (upholding general personal jurisdiction where defendant had millions in sales and a "broad distributorship network" in the forum state).

The record shows that Vendio earns substantial revenues, at least $300,000 in 2007, from customers in Minnesota.  But there is no indication that, to provide service for these customers, Vendio maintains ongoing business operations in Minnesota.  Vendio has no premises located in Minnesota and it is not licensed to do business there.  (Exh. 2 at 1.)  Nor is there the sort of broad sales or distribution network that would establish systematic and continuous contacts.  For these reasons, this Court concludes there is no basis to exercise general personal jurisdiction here.  *Cf. Hockerson-Halbertstadt, Inc. v. Propet USA, Inc.*, 62 Fed.Appx. 322, 337 (Fed. Cir. 2003) (ruling that $32,000 in internet sales to forum state was not enough to show general personal jurisdiction).

### 4.        Specific Personal Jurisdiction

For the theory of specific personal jurisdiction, it is sufficient for the defendant to have minimal contacts with the forum state, so long as the plaintiff's claim arises from those contacts. The Federal Circuit has formulated a three-part standard for determining whether the exercise of specific personal jurisdiction is appropriate, asking if (1) the defendant purposefully directed its activities at the forum state; (2) the plaintiff's claims arise from those activities; and (3) litigation of such claims in the forum state comports with fairness and substantial justice.  *Akro Corp. v. Luker*, 45 F.3d 1541, 1545 (Fed. Cir. 1995).

a.      **Activities Directed at Forum State**

i.      **Internet Contacts and the *Zippo* Standard**

In the context of the current litigation, the first element of this standard largely depends on the quality of Vendio's internet contacts with Minnesota.  The Federal Circuit has yet to offer much guidance in this area.  *Cf. Multi-Tech Sys., Inc. v. VocalTec Communications, Inc.*, 122 F.Supp.2d 1046, 1049 n. 5 (D.Minn. 2000).  Perhaps the strongest indication may be taken from its decision in *Trintec Industries, Inc. v. Pedre Promotional Products, Inc.*  395 F.3d 1275 (Fed. Cir. 2005).  The court noted that a defendant advertised over the internet, but it did not analyze the impact of this fact, and instead remanded to the district court for jurisdictional discovery.  *Id.* at 1281-83.  But in dictum, the court mentioned a leading case on the internet and personal jurisdiction, the decision of the Western District of Pennsylvania in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*  952 F.Supp. 1119 (W.D.Pa. 1997).

The *Zippo* court proposed a sliding-scale standard for evaluating the quality of internet contacts.  At the top of this scale, where personal jurisdiction is appropriate, are situations where a defendant is buying or selling over the internet.  At the bottom, where personal jurisdiction is inappropriate, are situations where a defendant posts information but does not allow interaction by internet users.  As the level of interactivity or commerce increases, however, it becomes more likely that internet activity will supply sufficient contacts for personal jurisdiction.  *Id.* at 1224.

There are several reasons that the *Zippo* standard is not entirely helpful here.  One is that *Zippo* is sometimes criticized for focusing too much on the internet operations of the defendant, without examining the relationship between those operations and the forum state.  *See Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 452 (3d Cir. 2003) (noting that post-*Zippo* decisions "have made explicit the requirement that the defendant intentionally interact with the forum state

via the web site"); *cf. GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349-50 (D.C. Cir. 2000) (rejecting personal jurisdiction where there was no evidence forum residents used the defendant's interactive website).

Another is that this litigation does not, strictly speaking, only involve a website. Instead, this litigation is about software. Although the software must be downloaded via the internet, its activation and utility depend entirely on the independent conduct of its users.

As a result, the current case is entirely distinguishable from cases where the plaintiff has attempted to show minimal contacts by pointing to a defendant's advertisements on the internet. Courts frequently rule that advertising via the internet is at the passive end of the *Zippo* standard, and therefore, advertising by itself does not support personal jurisdiction. *See* Richard E. Kaye, Annotation, *Internet Web Site Activities of Nonresident Person or Corporation as Conferring Personal Jurisdiction*, 81 A.L.R.5th 41 § 3 (2000 & Supp. 2007).

In this context, courts commonly draw an analogy between an informational website on the internet and an advertisement in a nationally published magazine. In either case, publication of the website or the advertisement by itself is not enough to justify personal jurisdiction. *See, e.g., Principal Financial Servs., Inc. v. Big Finance & Ins. Servs., Inc.*, 426 F.Supp.2d 976, 980-81 (S.D.Iowa 2006). But the current circumstances do not involve the merchant who places the advertisement or the goods or services that are advertised. By way of analogy, Dealio software is more like the magazine itself—the media that is being published to the forum state—and Vendio is the publisher.

### ii.      Internet Contacts and Accused Software

Being mindful of these differences, and the limitations of the *Zippo* standard, this Court turns to other cases that may be more helpful here.

One illustrative case is *CoolSavings.com, Inc. v. IQ.Commerce Corp.*, a decision from the Northern District of Illinois.  53 F.Supp.2d 1000 (N.D.Ill. 1999).  This patent infringement suit involved a system for downloading coupons over the internet.  Unlike the current case, the system operated entirely through a website and did not require users to download proprietary software.  Because this system was still in development, few had accessed the website from the forum state.  But the defendant had separately retained a marketing firm in the forum state to promote the website and solicit advertisers.  *Id.* at 1001-02.

After noting this scenario did not "neatly fit" into the *Zippo* standard, the *CoolSavings* court reasoned that the operation of the website must be taken with other relevant circumstances. It held that the website, along with the conduct of the marketing firm within the forum state, was enough to show that the defendant purposefully directed its activities there.  *Id.* at 1003 & n. 3. The current litigation involves many more users, in the thousands, but there is no indication that Vendio has taken any other action to promote Dealio software in Minnesota.

Further guidance may be taken from the decision of this District in *Multi-Tech Systems, Inc. v. VocalTec Communications, Inc.*  122 F.Supp.2d 1046 (D.Minn. 2000) (Montgomery, J.). Another suit for patent infringement, it involved software allowing telephone use via the internet. The defendant, an Israeli corporation, sold the software through brick-and-mortar retailers in Minnesota and through its own website.  *Id.* at 1049-50.

The *Multi-Tech Systems* court concluded that internet sales, combined with sales through conventional retailers, were enough to show that the defendant purposefully directed its activities into Minnesota.  *Id.* at 1050.  The current litigation, by comparison, does not involve the sale of software.  But the free downloads have a plain commercial purpose, to encourage users to buy

from advertised merchants, and there is ample evidence that the software has been downloaded by users in Minnesota.

Also useful are cases, though not in patent law, where users downloaded the software that is at the center of the parties' dispute. One increasingly common scenario is where the defendant distributes peer-to-peer file sharing software that may be used to illegally download copyrighted films or music. When media producers bring suit for copyright infringement, the presence of software users in the forum state is enough to show that the defendant purposefully directed its activities there. *See Arista Records, Inc. v. Sakfield Holding Co.*, 314 F.Supp.2d 27, 32 (D.D.C. 2004); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1087 (C.D.Cal. 2003).

### iii.    Analysis of Internet Contacts

This Court now returns its attention to the current case. To review, Dealio software requires a user to download and register it before using it. The software must then ping Vendio's servers from the user's computer to function. Because activation of the software requires independent action by a user, and because the software cannot function without the acquiescence of the user, these circumstances show a high degree of interactivity.

If the *Zippo* standard applies here, this level of interactivity appears to favor the exercise of personal jurisdiction. More importantly, this interaction can be connected to Minnesota, based on the fact that thousands of Dealio software users are in Minnesota. But mechanical application of *Zippo* need not be the sole framework for evaluating these contacts.

The peer-to-peer file sharing cases strongly support the proposition that, where users in the forum state download and use software published by the defendant, there is sufficient proof that the defendant purposefully directed its activities into the forum state. The reasoning in

*Multi-Tech Systems* is consistent with this rule. Although *Multi-Tech Systems* focused on sales rather than downloads, it was the existence of commercial activity, and not the precise nature of that activity, that was material. *CoolSavings*, by comparison, did not need to focus on activity of users in the forum state, because there were other types of contacts involved.

In the current litigation, personal jurisdiction hinges on the connections with Minnesota users, not Minnesota merchants. Even if the record is taken in Northbrook's favor, it shows only nominal revenue flowing to Vendio from Minnesota merchants, and that revenue is earned from affiliate program administrators in other states. But there is ample reason to find that thousands of Minnesota residents have downloaded and used Dealio software. Such contacts are more than enough to conclude that Vendio has purposefully directed its activities into Minnesota.

### iv.     Purposeful Direction, Intent, and the Stream of Commerce Test

Vendio raises an argument, against this conclusion, that requires careful discussion here. Because it does not learn the physical location of users who download Dealio software, Vendio contends that it could not purposefully direct its activities into Minnesota. Implicit in this position is the notion that, if a defendant does not know where its activities are directed, then it cannot have purposeful conduct toward a forum state.

In the context of a personal jurisdiction analysis, purposefulness is not based on whether a defendant knowingly contacts the forum state. It instead depends on whether the defendant has reason to be aware, from its purposeful conduct, that it may be haled into the courts of the forum state. This question is informed by whether the defendant receives such benefits from the forum state that it may also expect to be subject to liability there. *See Shaffer v. Heitner*, 433 U.S. 186, 215-16 (1977).

The U.S. Supreme Court examined these principles, and the question of foreseeability, in *World-Wide Volkswagen Corp. v. Woodson*. 444 U.S. 286 (1980).  It reasoned that the fortuitous entry of a defendant's product into the forum state, even if this entry is foreseeable, is not enough to show that a defendant purposefully directed its activities there.  *Id.* at 295-96.

To evaluate what level of foreseeability is required, the Court instead developed what has since been called the "stream of commerce" test.  Under this test, there are sufficient contacts if a business "delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State."  *Id.* at 298.  When considering the expectations of the defendant in this context, the Court looked at whether the product entered the forum state because of the conduct of unrelated third parties, or whether the defendant had a framework in place for marketing its product directly to residents of the forum state.  *Id.* at 297-98.

Subsequent Federal Circuit cases have applied the stream of commerce test and used it to evaluate whether a defendant purposefully directed activities toward a forum state.  When using this standard, these cases evaluate purposefulness not in terms of a defendant's intent, but instead by whether the defendant's contacts were foreseeable rather than fortuitous.  *See Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 428-29 (Fed. Cir. 1996); *North American Philips Corp. v. American Vending Sales, Inc.*, 35 F.3d 1576, 1580-81 (Fed. Cir. 1994).  This Court concludes that the stream of commerce test provides an appropriate means to determine whether Vendio has acted purposefully here.

The question then becomes how the stream of commerce test applies when the internet is involved.  Depending on how a defendant uses the internet, it may be viewed as a framework for marketing a product directly to residents of the forum state.  If so, it is reasonable to infer that a defendant may foresee that its products will enter that state.

In accordance with these principles, case law in this area typically focuses on whether a defendant's internet marketing strategies are targeted toward users in the forum state. Where a defendant's products reached the forum state, and a website provided support for purchasers who resided there, there was sufficient evidence of purposeful direction toward that state. *Jones v. Boto Co.*, 498 F.Supp.2d 822, 829 (E.D.Va. 2007). The same is true where a defendant sells its goods online, and those goods are purchased by users in the forum state, even though the website is not expressly targeted toward the forum state. *American Eyewear, Inc. v. Peeper's Sunglasses & Accessories, Inc.*, 106 F.Supp.2d 895, 901 (N.D.Tex. 2000); *Stomp, Inc. v. NeatO, LLC*, 61 F.Supp.2d 1074, 1078-79 (C.D.Cal. 1999).

What is particularly notable about these cases is that the defendants claimed, like Vendio does here, that they did not know their internet activities would reach the forum state. But these arguments were uniformly rejected, often with the observation that a defendant doing business online has ample reason to expect that its activities will reach a distant forum. *See Jones*, 498 F.Supp.2d at 829; *Stomp, Inc.*, 61 F.Supp.2d at 1078.

Vendio made its Dealio software software freely available on its website, without restricting its availability to users in a particular geographic area. And Dealio software offers its users the opportunity to buy goods from major retailers in the United States. Although Dealio software is not expressly directed at Minnesota residents, the marketing of the software is plainly directed toward users nationwide, including Minnesota. And this observation is confirmed by the fact that thousands of Minnesota residents have actually downloaded and used Dealio software.

Because Dealio software is freely available online, Vendio placed it into the stream of commerce. And because Vendio has directed its marketing activities toward Minnesota

residents, its contact with Minnesota is foreseeable rather than fortuitous.  As a result of its conduct, Vendio benefits from the laws and privileges of Minnesota, and so it may expect to be held liable there.   In these circumstances, the only reasonable conclusion is that Vendio purposefully directed its activities into Minnesota.

As an internet-oriented business, Vendio must be well aware that the internet offers the opportunity to enter remote markets at minimal cost.  But it must also know that this opportunity comes with a corresponding danger, that its activity may result in being held liable in a distant forum.  In such circumstances, Vendio cannot avoid jurisdiction simply by ignoring information about the physical location of its Dealio software users.

If Vendio's position were taken to its logical conclusion, then any entity doing business over the internet could avoid jurisdiction simply by disregarding information about the location of its customers.  Such a rule overlooks other concerns, such as interactivity, foreseeability, and commercial activity, which are the ordinary hallmarks of internet jurisdictional analysis.  With due regard for these concerns, this Court is persuaded that jurisdiction is appropriate here.

### v.    Revenues as a Measure of Activity in the Forum State

Vendio also implies that, because it receives minimal revenue from the use of Dealio software in Minnesota, its activities here are insufficient for personal jurisdiction.  At the motion hearing, Northbrook focused on this issue, arguing that revenues should not be the sole means to measure Vendio's contacts with Minnesota.

Though the Federal Circuit does not squarely address this issue, it treats revenues as but one factor when examining contacts with a forum state.  Other commercial activities are no less important.  *See Dianippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed. Cir. 1998); *cf. Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found.*, 297 F.3d 1343, 1352

(Fed. Cir. 2002) (upholding minimum contacts, where defendant engaged in licensing activity in the forum state, without considering whether the defendant earned revenues there).

Given the intensive analysis up to this point, this Court thinks it enough to observe that Vendio's revenues are not particularly material to the issues presented here.  The primary factual concerns, instead, are the distribution and use of the Dealio software.  To the extent that Vendio asserts that its revenues are insufficient, however, it may be implying that there are no sales that support jurisdiction over a claim for patent infringement.  This line of inquiry anticipates the next issue in this analysis, whether Northbrook's claims arise from the activities that Vendio directed toward Minnesota.

### b.    Claim Arising out of Activities in Forum State

Assuming that Vendio has purposefully directed its activities toward Minnesota, the next issue is whether Northbrook's patent infringement claims arise out of those activities.  This issue is informed by the statute that permits suit for patent infringement.  *See 3D Sys., Inc. v. Aarotech Labs., Inc.*, 160 F.3d 1373, 1379 (Fed. Cir. 1998).  Infringement occurs under 35 U.S.C. § 271(a) when one "makes, uses, offers to sell, or sells any patented invention[.]"

Because Dealio software is available for free, there is evidently no sale under § 271(a).  But it is plain that, when Minnesota residents employ Dealio software's search feature, Vendio is using accused technology to provide this service.  Because the accused software allegedly infringes the patents-in-suit, these circumstances establish that Northbrook's patent infringement claim arises from Vendio's activities in Minnesota.[5]   *Multi-Tech Sys., Inc. v. Vocal-Tech*

---

[5] Because usage is a sufficient theory to establish jurisdiction over the infringement claims here, it is not necessary to consider whether Vendio derives any other economic gain that may constitute a sale under § 271(a).  But there is little question that, even though Vendio distributes Dealio software for free, it does so to its commercial advantage.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1086-87 (C.D.Cal. 2003) (holding that where

*Communications, Inc.*, 122 F.Supp.2d 1046, 1051 (D.Minn. 2000) ("This case is unusual because the use of the interactive technology itself infringes the plaintiff's patent.").

Although Northbrook prevails on this outcome, it has an argument it is prudent to address here.  It proposes that, to determine whether its claim arises out of Vendio's contacts, it is proper to use the "effects test."  This test originates from the U.S. Supreme Court decision in *Calder v. Jones*, 465 U.S. 783 (1984), and it is typically used to determine personal jurisdiction in matters involving intentional torts.  The general analysis, under the effects test, is whether a defendant intentionally committed a wrongful act and intended the harm to be felt in the forum state.  *See Finley v. River North Records, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998) (fraud); *General Elec. Capital Corp. v. Grossman*, 991 F.2d 1376, 1387-88 (8th Cir. 1993) (corporate malfeasance).  Because patent infringement is an intentional tort, Northbrook argues, this test should be applied here.

The Federal Circuit sometimes uses the effects test to evaluate, in a declaratory judgment action, whether the action arises out of patent licensing activity.  *See Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1203-04 (Fed. Cir. 2003); *Akro Corp. v. Luker*, 45 F.3d 1541, 1547 (Fed. Cir. 1995).  Contrary to the proposition urged by Northbrook, however, these cases do not apply the effects test to patent infringement claims, nor is there any indication the Federal Circuit would embrace such a rule.

The probable reason is that, except for vicarious liability, patent infringement does not require an intent to infringe.  *See Intel Corp. v. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991).  Assuming that patent infringement may be characterized as a tort, *Trintec Indus. Inc. v.*

---

accused software was available for free and was used to facilitate copyright infringement, distribution to the forum state was "an essentially commercial act" for "the singular purpose of facilitating advertising and generating income").

*Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1280 (Fed. Cir. 2005), it is not an intentional tort. For this reason, it is not appropriate to apply the effects test here. *Glaxo Inc. v. Genpharm Pharms., Inc.*, 796 F.Supp. 872, 876-77 (E.D.N.C. 1992).

### c.    Fairness and Substantial Justice

In this specific personal jurisdiction analysis, the remaining issue is whether the exercise of personal jurisdiction accords with fairness and substantial justice. When examining this issue, a court generally considers the consequences of haling the defendant into the forum state, such as (1) the burden on the defendant; (2) the interest of the forum state; (3) the interest of the plaintiff in obtaining relief; (4) the interest of the interstate judicial system in expeditious resolution of controversies; and (5) the interest of the states generally in furthering social policy. *Viam Corp. v. Iowa Export-Import Trading Co.*, 84 F.3d 424, 429 (Fed. Cir. 1994).

When examining the factors, fairness and substantial justice are not compromised except in the

> rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum.

*Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1568 (Fed. Cir. 1994).

As Vendio is based in California, and all its offices are located there, it faces substantial burdens when litigating in Minnesota. But Northbrook has a countervailing interest in obtaining relief in Minnesota. And because Dealio software affects users and businesses in Minnesota, the state has an interest as well.

This Court concludes that, because both the interests of Northbrook and Minnesota have substantial weight, the exercise of personal jurisdiction does not violate fairness or substantial justice. This outcome means that in this matter, all the elements for specific personal jurisdiction

over Vendio are satisfied.  So its motion to dismiss for lack of personal jurisdiction is properly

denied.  And because Vendio only asserts lack of personal jurisdiction against Northbrook's

motion to amend, this motion is correspondingly granted.

### B.      Transfer of Venue

Vendio alternatively argues that, even if the exercise of personal jurisdiction is proper

here, venue should be transferred to the Northern District of California.  When deciding a motion

to transfer venue in a patent case, a court applies the law of its regional circuit, rather than that of

the Federal Circuit.  *Storage Technology Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 836 (Fed. Cir.

2003).

A district court may, for the convenience of the parties and witnesses and in the interests

of justice, transfer venue to any district where the action may be brought.  28 U.S.C. § 1404(a).

Although a motion for transfer of venue is committed to the discretion of the district court, such

a motion should not be granted freely.  It is presumed that a case should be venued in the current

forum, and the moving party has the burden to show that a proposed forum is more convenient.

*Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997); *Graff v. Qwest*

*Communications Corp.*, 33 F.Supp.2d 1117, 1121 (D.Minn. 1999).

Where the proposed forum is more convenient for the moving party, and would only shift

inconvenience to the nonmoving party, transfer is appropriately denied.  But where the proposed

forum provides more access to live witness testimony, and will provide some extra convenience

for the nonmoving party, transfer may be granted.  *K-Tel Int'l, Inc. v. Tristar Prods., Inc.*, 169

F.Supp.2d 1033, 1045-46 (D.Minn. 2001).  A court may also consider the relative ability of the

parties to bear the costs of litigating in a distant forum.  *Radisson Hotels Int'l, Inc. v. Westin*

*Hotel Co.*, 931 F.Supp. 638, 641-42 (D.Minn. 1996).

Vendio proposes that this litigation be transferred to the Northern District of California. It maintains its offices there, as well as the servers for its website and for Dealio software operations.  And it has thirty employees, including several who allegedly had important roles in the development of the accused search feature in Dealio software.  (Exh. 2 at 1, 3.)  Vendio adds that two of its employees, with material knowledge about Dealio software, recently departed. Because these persons continue to reside in the Northern District of California, Vendio asserts, only that district has the power to subpoena them.  (*See* Exh. 5 at 4.)

Northbrook responds that it has but one material witness, Mark Wolfe, but that he has a substantial role in this litigation.  Wolfe is the founder, and apparently the sole stakeholder, in Northbrook.  He is also the named inventor and the prosecutor of the patents-in-suit.  According to Wolfe, Northbrook lacks the resources to litigate in California, and he must participate in this litigation personally to pursue Northbrook's claims for patent infringement.  (Exh. 10 at 1, 4-7; Exh. 11 at 1-2.)

Evidence about Dealio software, and witnesses with knowledge regarding its accused features, are generally located in California.  For this reason, it is somewhat more convenient. This benefit however, favors Vendio at the expense of Northbrook.  Vendio would have its proof close at hand, and would avoid the cost of litigating in a distant forum, whereas Northbrook would take its evidence to California and accrue substantial costs litigating there.  Assuming it is necessary to subpoena witnesses in California, this fact is not particularly material, as the parties evidently will have to do so there regardless of where this matter is ultimately venued.

Transfer of venue to California, therefore, effectively shifts cost and inconvenience from Vendio to Northbrook.  In such circumstances, Vendio does not overcome the presumption that

favors litigation of this matter in Northbrook's selected forum.  It is also appropriate, therefore, to deny Vendio's motion to transfer venue.[6]

### C.    Protective Order

The next inquiry in this matter arises from Vendio's application for a protective order. As this Court signaled in an order on January 18, 2008, the application is in effect a motion, now ripe for decision.  This Court further notes that the application seeks nondispositive relief, which ordinarily is not handled by a report and recommendation to the district judge.  This procedure requires some explanation.

Since this litigation began, Vendio has forcefully opposed disclosure of its confidential information to Wolfe, for reasons that will be explored later.  Pending a decision on a protective order, Northbrook has limited Wolfe's access to its documents.  Based on the same concerns about confidentiality, the parties have redacted many of the documents that were filed for the motions currently under consideration.  To ensure an appropriate public record for these motions, subject to any justifiable interests in confidentiality, this Court deems it appropriate to handle these issues now.

### 1.    General Principles

Protective orders are controlled by Rule 26(c), which provides that for good cause shown, a party may seek an order that limits the scope or dissemination of discoverable information.  A court has broad discretion to fashion a protective order, and the general public right of access

---

[6] Vendio notes the question of proper venue, citing the provision that determines venue in patent cases, 28 U.S.C. 1400(b).  But Vendio does not squarely address the issue, nor has it brought a motion to dismiss for improper venue under Rule 12(b)(3).  Furthermore, the parties evidently do not contest that venue is appropriate here so long as there is personal jurisdiction.  Whether or not this rule is correct, the question of improper venue is not meaningfully presented for decision at this time. *Cf. VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1582-83 (Fed. Cir. 1990).

does not reach pretrial discovery. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36-37 (1984). Rule 26(c)(7) specifically contemplates such protection for confidential commercial information. *See Phillips ex rel. Estates of Byrd v. General Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002).

A party seeking a protective order has the burden to show good cause. *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1313-14 (11th Cir. 2001); *General Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 1212 (8th Cir. 1973). To make this showing, the moving party cannot rely on broad or conclusory allegations of harm. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981). Where the moving party makes a sufficient showing that public disclosure will cause it harm, the burden then shifts to the nonmoving party to demonstrate that open disclosure outweighs any private interests in nondisclosure. *American Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 740 (Fed. Cir. 1987); *Cippolone v. Liggett Group, Inc.*, 785 F.2d 1108, 1122 (3d Cir. 1986).

### 2.    Protective Orders Against Patent Counsel

Patent litigation often requires parties to disclose confidential information to one another. And where the parties are competitors in a particular field, there is danger that one party may use such information to the competitive disadvantage of the other. The typical means to mitigate this risk is through a protective order that allows documents to be designated "attorneys eyes only." This designation ensures that only counsel, and no other officers or employees of the party, have access to confidential information. Counsel may thus advance their party's interests without the risk that an adverse party will use confidential information for purposes other than litigation. *See Avocent Redmond Corp. v. Rose Elecs., Inc.*, 242 F.R.D. 574, 575-76 (W.D.Wash. 2007); *Glaxo Inc. v. Genpharm Pharms., Inc.*, 796 F.Supp. 872, 874 (E.D.N.C. 1992).

This procedure works if litigation counsel consists of an outside law firm, or "external counsel," whose involvement is limited to litigation alone.  But where a party employs its own attorneys, or "internal counsel," as litigation counsel, there is a risk that these attorneys may use information acquired in litigation in other areas of their employment.  Notwithstanding their best professional efforts, internal counsel may acquire confidential information in litigation and use it for other matters, to the advantage of their employer and the disadvantage of the opposing party.  *See Intel Corp. v. Via Techs., Inc.*, 198 F.R.D. 525, 529-30 (N.D.Cal. 2000).

The Federal Circuit considered the appropriate scope of a protective order, in a scenario where internal counsel also served as litigation counsel, in *U.S. Steel Corp. v. United States*.  730 F.2d 1465 (Fed. Cir. 1984).  The court first observed that, when deciding whether counsel should have access to confidential information, designation as internal or external counsel is immaterial.  The court instead took a more factually oriented approach, asking whether counsel is involved in "competitive decisionmaking" for the party.  *Id.* at 1468-69.

The *U.S. Steel* court described involvement in competitive decisionmaking as

> counsel's activities, association, and relationship with a client that are such as to involve counsel's advice and preparation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor.

*Id.* at 1468 n. 3.  In dictum, the court also suggested a protective order against internal counsel may not be warranted in circumstances that work "extreme and unnecessary hardship" against a party.  *Id.* at 1469.

Since *U.S. Steel*, the competitive decisionmaker standard, with the hardship exception, has governed protective orders against patent counsel.  *See Matsushita Elec. Indus. Co. v. United States*, 929 F.2d 1577, 1578-79 (Fed. Cir. 1991); *Avocent Redmond Corp.*, 242 F.R.D. at 577.  In the current litigation, the parties' dispute requires consideration of both the underlying standard

and the exception.  Before commencing this analysis, however, some more factual background is useful.

### 3. Competitive Decisionmaking

#### a. Background

As noted earlier, Wolfe is the named inventor for all the patents-in-suit.  He prosecuted all the patents and is currently the sole assignee.  Wolfe then formed Northbrook as a means to pursue licensing of the patents, and Northbrook has no other business.  So Northbrook does not provide any products or services, and it lacks any facilities for implementing or marketing the technologies in the patents-in-suit.  Wolfe further asserts that Northbrook has no future plans to further market or develop these patents.  (Exh. 10.)

The record, however, does not disclose the exact nature of the relationship between Wolfe and Northbrook.  Vendio alleges that Wolfe is the sole member of Northbrook and that, as a practical matter, Northbrook is but an alter ego for Wolfe.  Setting aside the legal ramifications of whether Northbrook is an alter ego, there otherwise is sound support for Vendio's allegations.  From his own declaration, it may be inferred that Wolfe controls licensing negotiations and litigation activity for Northbrook.  And these matters appear to be Northbrook's entire business.  Given his role as the inventor and the assignee for the patents, and the authority that he exercises on behalf of Northbrook, it is reasonable to conclude that Wolfe is the principal stakeholder in Northbrook, if not its sole member.

This conclusion means that Wolfe is a decisionmaker, if not the sole decisionmaker, for Northbrook.  Northbrook does not materially dispute that Wolfe is involved in decisionmaking.  It instead argues that these decisions are not competitive, because Northbrook does not compete with Vendio.  Northbrook contends that, unlike Vendio, it does not develop or sell software, nor

does it engage in any other activity to commercialize the technology in the patents-in-suit. In particular, it denies that it makes any decisions about pricing or design, the examples that the *U.S. Steel* court used to describe competitive decisionmaking.

This argument may be framed into two discrete areas. One is that Northbrook does not engage in competitive activities against Vendio. The other is that, because Northbrook lacks the ability to market or manufacture its own products, it cannot be deemed a competitor in any case.

### b.    Activities Involving Competitive Decisionmaking

As a threshold matter, this Court observes that the *U.S. Steel* court did not take a narrow view of competitive decisionmaking. Though it signaled that pricing and design may be types of competitive decisionmaking, it included "any or all" decisions that are influenced by "similar or corresponding information about a competitor." *U.S. Steel*, 730 F.2d at 1468 n. 3. Ensuing decisions, though none from the Federal Circuit itself, have examined whether particular sorts of activities involve competitive decisionmaking.

In this area, the parties evidently focus on cases involving patent prosecution. By itself, this activity may not be enough to implicate competitive decisionmaking. *See Avocent Redmond Corp.*, 242 F.R.D. at 578-79; *MedImmune, Inc. v. Centocor, Inc.*, 271 F.Supp.2d 762, 773-74 (D.Md. 2003). Such decisionmaking is more likely to be implicated, however, where there is a relationship between the prosecution and the patents-in-suit. In particular, where related patents are being prosecuted and litigated simultaneously, a party may obtain strategic advantage by using information from the litigation in the patent prosecution. *Mercexchange, L.L.C. v. eBay, Inc.*, 467 F.Supp.2d 608, 624-25 (E.D.Va. 2006); *Interactive Coupon Mktg. Group v. H.O.T.! Coupons, LLC*, No. 98-7408, 1999 WL 618969 at *2-*3 (N.D.Ill. Aug. 9, 1999).

Because Northbrook is not currently engaged in patent prosecution, however, these cases are not very useful here. Northbrook's business, and thus its decisionmaking, instead involves patent *licensing*. For this reason, a better question is whether counsel's involvement in licensing will implicate competitive decisionmaking.

Only one published decision, from the Northern District of California, appears to address this issue. *Intel Corp. v. Via Techs., Inc.* involved internal counsel who was actively involved in negotiating licensing agreements. 198 F.R.D. 525 (N.D.Cal. 2000). As part of these duties, counsel evaluated "the strength of the patent, [her client's] products implicated by the patent, and competitors' products implicated by the patent." *Id.* at 530. The court ruled that this activity involved competitive decisionmaking, crediting testimony that such activity "directly affected [her client's] competitiveness in the market by affecting [her client's] ability to sell products." *Id.*

Though the current litigation involves different circumstances, the *Intel* decision remains persuasive here. Perhaps the most important principle is that licensing, by itself, has an impact on the competitive posture of a business. A license provides a business with the ability to benefit from the patentee's monopoly on the patented technology. Without a license, the business faces the costs of liability, or it must develop some other alternative to the invention.

The *Intel* court also implicitly recognizes that licensing negotiations require counsel to evaluate what a patent is worth. A license may be worth more where the patent is particularly useful, or where it avoids the cost to develop proprietary technology; a license may be worth less where the patent is vulnerable to concerns about enforceability.

When defending against infringement claims, an accused party is highly likely to provide confidential information that is material to all of these issues. Such information may be used to

assess the cost of a license.  So there is a pricing decision that can be shaped by corresponding information from a competitor.  Involvement in a party's licensing activity, therefore, implicates competitive decisionmaking.

### c.    Competitive Posture; Ability to Exploit Patented Technology

As the preceding analysis suggests, the question of competitiveness does not depend on whether a party markets or manufactures a competing product.  Put differently, competition can be inferred from shared interest in a single patented technology, even though the patentee lacks the capital to produce the technology.  And this principle is supported elsewhere in patent law.

A patentee may exploit patented technology in many ways, either by using or marketing the patented technology itself; by licensing the right to use or market that technology to others; or by excluding others from using or marketing the technology.  *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 (Fed. Cir. 1991).  But a patentee has no obligation to use the patented technology, and pursuant to the right to exclude others, may limit or prevent others' use of that technology.  *See Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 880 (Fed. Cir. 1995) ("A patentee is generally entitled to determine how it wishes to commercialize its invention to optimize its economic benefit from the patent grant."); *see also Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1340 (Fed. Cir. 2006) (recognizing field restrictions on patent licensees' use); *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 809 (Fed. Cir. 2002) (describing scope of patentees' right to exclude).

A patentee may decide, therefore, to profit through licensing rather than by marketing or manufacturing the patented technology.  But under either scenario, the patentee has commercial interests that conflict with other businesses using similar technology.  So even where a patentee

lacks the ability to produce the technology, the patentee is in a competitive posture against other businesses in the field.

### d.    Result

Although Northbrook evidently lacks the capability to market or manufacture its patents, its interest in the patented technology is enough to establish its competitive posture with potential licensees such as Vendio.  And because Wolfe essentially controls all of Northbrook's affairs, including its licensing activity, he is involved in the competitive decisionmaking of Northbrook.

Vendio has accordingly shown that Wolfe is involved in competitive decisionmaking and, if its confidential information is disclosed to him, Vendio faces substantial harm. *Cf. Intel Corp.*, 198 F.R.D. at 530.  In such circumstances, it would ordinarily be appropriate to enter a protective order that prevents Wolfe from accessing Vendio's confidential information.  The analysis now turns whether such an order causes hardship to Northbrook.

### 4.    Hardship

### a.    Background

In its arguments regarding hardship, Northbrook discusses Wolfe's unique multiple roles, both as its principal and as the inventor for the patents-in-suit.  According to Wolfe, his work as the inventor means that he has unique qualifications in the area of the patented technology.  In particular, Wolfe claims expertise in obsolete software, which is evidently representative of the state of the art at the time the patents-in-suit issued.  To determine whether Dealio software infringes the patents-in-suit, Wolfe implies, it will be necessary to compare Dealio software with the obsolete software.  (Exh. 10 at 4-5.)

Wolfe adds that such obsolete software may no longer be available for analysis or study. So if Northbrook were to retain an expert, Wolfe contends, that expert faces substantial obstacles

to understanding of the patented technology.  (*Id.*)  Due to his unique qualifications, Northbrook asserts that Wolfe must be its expert witness, and otherwise, it cannot afford to retain or educate another expert.  (Exh. 11 at 2.)

Some different issues arise out of the legal relationship between Wolfe and Northbrook. As noted beforehand, the record does not precisely identify this relationship, but it is reasonable to infer that Wolfe is the principal of Northbrook and he controls its affairs.  If so, then Wolfe is also directing litigation strategy and supervising external counsel.  What is more, at the motion hearing, Northbrook further indicated that Wolfe would also act as litigation counsel and would be conducting depositions.

What this litigation presents, therefore, is a scenario where one person is the patentee; a fact witness and an expert witness; a controlling officer for a party; and counsel of record.  Such circumstances are evidently unprecedented.[7]  Northbrook argues that, if Wolfe is constrained by a protective order, it will impair Wolfe's ability to perform one or more of his assorted roles. And Northbrook contends that it is unable, in part due to lack of financial resources, to substitute

---

[7] According to Northbrook, there are two other cases where Wolfe has performed multiple roles for Northbrook, yet he was not subject to a protective order.  But Northbrook only identifies one case, *Northbrook Digital Corp. v. Browster*, No. 06-4206 (D.Minn.), another patent infringement suit in this District.

According to the record in *Browster*, Northbrook was represented by Peter M. Lancaster, Esq.—also counsel of record in the current litigation—and Wolfe, among others.  But Wolfe has not signed or filed any pleadings in the *Browster* litigation, nor has he appeared as counsel for Northbrook at any hearings or conferences.  Although Magistrate Judge Arthur J. Boylan entered a protective order on February 6, 2008, the parties stipulated to the order, and the stipulation does not mention Wolfe.  And by an order on February 13, 2008, Judge Michael J. Davis noted that Wolfe was providing opinion evidence for Northbrook, but did not otherwise comment about him.

There is no indication that either judge was advised of unique concerns about Wolfe.  A possible explanation is that Browster, the accused infringer, is out of business and it does not risk meaningful harm from disclosing its confidential information to Wolfe.  By comparison, Vendio is an ongoing business posed with a real risk of harm, and it raises concerns about Wolfe that are evidently presented for the first time in this litigation.

another person in these roles.  So it essentially claims a protective order against Wolfe will put it out of court.

### b.      Analysis

Turning to the analysis, a few rules may be taken from published decisions in this area. Hardship cannot solely be based on a showing that a party cannot afford external counsel, *A. Hirsh, Inc. v. United States*, 657 F.Supp. 1297, 1305-06 (C.I.T. 1987), or that it may have difficulties supervising external counsel, *Intel Corp. v. Via Techs., Inc.*, 198 F.R.D. 525, 528-29 (N.D.Cal. 2000).  Moreover, a court will presume that external counsel is competent to review confidential information on behalf of the party.  *Intel Corp.*, 198 F.R.D. at 528-29.

This rule has one notable exception.  Where internal counsel has specialized expertise about the patents-in-suit, and that expertise is necessary for evaluating confidential materials and supervising litigation, there is an adequate showing of hardship to overcome a protective order. *See Intel Corp.*, 198 F.R.D. at 528-29; *cf. U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1469 (Fed. Cir. 1984) (allowing internal counsel to retain access to confidential materials where the litigation was "extremely complex and at an advanced stage").

Similar principles have applied in circumstances that do not necessarily involve counsel. If a party has employees with "substantial experience in a narrow field that cannot be replaced in the open market," and thus denying those employees access to confidential materials will impair the party's ability to prosecute an infringement claim, there is a sufficient showing of hardship. *MGP Ingredients, Inc. v. Mars, Inc.*, 245 F.R.D. 497, 502 (D.Kan. 2007).  If a party chooses to use its employees as expert witnesses in litigation, however, a court may take measures to limit those employees' disclosures in other areas, such as patent prosecution.  *Mercexchange, L.L.C. v. eBay, Inc.*, 467 F.Supp.2d 608, 624-25 (E.D.Va. 2006).

Courts have not accorded much significance to the fact that a corporate officer is among those bound by a protective order. So where the president of a party had unique expertise on patented technology, he was allowed to access some confidential information for the purpose of preparing an expert opinion, but this access was carefully limited. *Micro Chem., Inc. v. Lextron, Inc.*, 193 F.R.D. 667, 668 (D.Colo. 2000). And where general counsel for a party was also the designated president pro tem for a closely held corporation, this relationship did not influence entry of a protective order limiting general counsel's access to confidential information. *See A. Hirsh*, 657 F.Supp. at 1299, 1305-06.

To summarize, hardship cannot be founded solely on concerns about inconvenience or expense. There must be some further showing that, because of a party's inability to access confidential information, it will lack access to evidence that is essential to its litigation. As the preceding analysis shows, examples include where a party cannot meaningfully supervise the litigation; or where a party's employees have such expertise that they are the only ones who can serve as expert witnesses.

### c.    Outcome

Northbrook has retained external counsel, and this Court presumes that external counsel is competent to evaluate Vendio's confidential information. If Wolfe is not allowed to access the information, and Northbrook incurs greater attorney fees or because retains outside experts, such increased costs do not establish hardship under the applicable case law. And though Northbrook claims that it cannot afford these expenses, that cost is balanced by the potential costs Vendio

faces from the dissemination of its confidential information.[8]  *Cf. A. Hirsh, Inc.*, 657 F.Supp. at 1305-06.

The hardship to Northbrook instead hinges on whether Wolfe has such unique knowledge that, without his participation, it will lack evidence essential to the prosecution of its case.  This Court is persuaded that Wolfe indeed has specialized knowledge about the patented technology. What is less clear, however, is whether this knowledge is essential to Northbrook's preparation of its case.  This inquiry must be framed by the question of how this knowledge will be applied to Vendio's confidential information.

For informed supervision of this litigation, Northbrook does not need to be advised of all Vendio's confidential information.  To illustrate, Vendio may disclose information regarding its accounts, its clients, or its marketing tactics that are relevant to this litigation, yet do not require particularized expertise to be understood by external counsel.  Nor can it be assumed, from the current record, that Wolfe is the only person able to analyze how Vendio's technology influences this litigation.  It must be presumed that external counsel, with the assistance of retained experts, is competent to carry out the representation on their own.

Regarding experts, Northbrook indicates that it may be costly to prepare an expert other than Wolfe, but it does not directly claim that Wolfe has "substantial experience in a narrow field that cannot be replaced in the open market."  *See MGP Ingredients, Inc.*, 245 F.R.D. at 502.  But at this stage of litigation, this Court need not decide whether Wolfe is irreplaceable.  It is enough to note, based on Northbrook's purported need to analyze now-obsolete software, Wolfe *may* be uniquely qualified to evaluate Vendio's confidential technology.  The record, however, requires further development to answer this question.

---

[8] The record lacks any accounting of Northbrook's financial resources, and so it is not possible to meaningfully test Northbrook's claim that it is unable to afford additional experts or attorneys.

### 5.      Order; Case Managment

This Court deems it best, under these circumstances, to exercise its discretion and craft a protective order that guards the interests of both parties.[9]   To prevent harmful disclosure of confidential information to Northbrook, Vendio may designate such information "attorneys eyes only" and it shall not be disclosed to Wolfe.  Assuming no dispute on the confidentiality of this information,[10] Northbrook may then move this Court for permission to disclose this information to Wolfe, on a showing of hardship consistent with the preceding analysis.

As the preceding analysis indicates, Northbrook has the burden to show hardship.  Before seeking relief from this Court, it is urged to focus on those documents it deems most essential to its case, and to carefully evaluate whether Wolfe's involvement is necessary.  Should a motion go forward, this Court will expect the parties to present evidence that specifically relates to the documents in question, rather than making generalized statements about harm or necessity.  And to further promote resolution of such matters, the protective order will also require the parties to meet and confer in good faith before seeking court intervention.

---

[9] At the motion hearing, Northbrook asserted that this District's form protective order, under the Local Rules, offers the best me ans to protect the parties' confidential information.  Although this Court agrees that the form protective order is generally useful for that purpose, the form does not constrain this or any judge's discretion to craft a protective order as needed, particularly where special circumstances require it.

[10] Pending entry of a protective order in this litigation, the parties have a preliminary agreement in place to maintain confidentiality of sensitive documents.  Pursuant to this agreement, Vendio has designated much of its production "attorneys eyes only" and prevented Wolfe from having access.  Northbrook argues that, because many of the designated documents are not particularly sensitive or are openly available to the public, Vendio is misusing the designatio n.  If the parties are unable to resolve these matters after conferring in good faith, Northbrook may also move this Court for relief, specifying particular documents in dispute.

One other remaining issue must be revisited at this point. At the outset of this discussion regarding a protective order, this Court observed that the parties have redacted some information they filed in support of their current motions, notwithstanding the absence of a protective order. Should the District Judge adopt this report, and so maintain jurisdiction over this matter, then it will be necessary to review the filings and determine what matters are properly sealed under a protective order. In the recommendations at the end of this report, this Court outlines some procedures for handling these issues.

### D.   Attorney as Witness

#### 1.   Introduction

In addition to the parties' motions, this Court deems it prudent to raise one other issue. As the preceding discussion indicates, Wolfe evidently intends to proceed in this litigation as a fact witness, an expert witness, and counsel of record. These circumstances plainly present an ethical concern about whether he may act as both an attorney and a witness.

To maintain public confidence in the legal profession and the courts, a court has inherent authority to regulate and discipline attorneys at bar, *North Star Hotels Corp. v. Mid-City Hotel Assocs.*, 118 F.R.D. 109, 112 (D.Minn. 1987), and a court may address violations of professional ethics on its own initiative, *O'Connor v. Jones*, 946 F.2d 1395, 1399 (8th Cir. 1991). Under Local Rule 83.6(d)(2), attorneys admitted to practice in this District are bound by the Minnesota Rules of Professional Conduct. Applicable here is Rule 3.7(a), which provides,

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1)   the testimony relates to an uncontested issue;
>
> (2)   the testimony relates to the nature and value of legal services rendered in the case; or

(3)     disqualification of the lawyer would work substantial
hardship on the client.

An attorney is a necessary witness, under this rule, where no other person can testify in the place of the attorney. *See Humphrey ex rel. State of Minnesota v. McLaren*, 402 N.W.2d 535, 541 (Minn. 1987) (discussing substantially similar predecessor rule). Because Wolfe is the named inventor on the patents-in-suit, there is little question that he is a necessary witness in the current litigation. At the motion hearing, Northbrook said as much, describing Wolfe as the "key trial witness."

The issue, therefore, is whether Wolfe may continue to participate as litigation counsel without violating the rule.[11] At the motion hearing, Northbrook represented that Wolfe would not be appearing as litigation counsel at trial. But it added that Wolfe would have a significant role in pretrial litigation, and in particular, that he would conduct most depositions. Consistent with its arguments regarding the protective order, Northbrook asserts that if Wolfe is not allowed to proceed with the representation, it will suffer hardship and be unable to prosecute its claims.

These circumstances raise two issues. One is whether Wolfe may conduct pretrial litigation without violating the rule. The other is whether disqualification of Wolfe works a substantial hardship to Northbrook. Minnesota authorities do not offer much guidance on either question. Because Rule 3.7 is adopted from the Model Rules of Professional Conduct, however, persuasive guidance may be found in case law from other jurisdictions that adopt the model rule. *Cf. In re Disciplinary Action Against Graham*, 453 N.W.2d 313, 321-22 (Minn. 1990); *Hurwitz v. Padden*, 581 N.W.2d 359, 363 (Minn. App. 1998).

---

[11] As noted beforehand, Northbrook contends that in other cases, Wolfe acted as both attorney and witness without being sanctioned. But it does not appear that the issue was ever called to the attention of the presiding judges. *See infra*, p. 30 n. 7.

### 2. Participation in Pretrial Litigation

The primary purpose served by the attorney-as-witness rule is to prevent undue confusion and prejudice at trial.  As the commentary accompanying the rule observes,

> A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others.  It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.

For this reason, participation in pretrial litigation is not cause for concern, except where it may potentially be disclosed at trial.[12]  *Culebras Enters. Corp. v. Rivera-Rios*, 846 F.2d 94, 99-100 (1st Cir. 1988); *Fognani v. Young*, 115 P.3d 1268, 1276-77 (Colo. 2005).

If Wolfe does conduct depositions in this litigation, this Court is not prepared to assume that none of the deposition testimony will be received at trial.  There is a risk that such evidence will reveal Wolfe's role as an attorney, which especially in complex patent litigation, may cause prejudice or confusion.  *See World Youth Day, Inc. v. Famous Artists Merchandising Exchange, Inc.*, 866 F.Supp. 1297, 1303-04 (D.Colo. 1994); *see also General Mill Supply Co. v. SCA Servs., Inc.*, 697 F.2d 704, 716 (6th Cir. 1982) (considering predecessor rule).

### 3. Hardship

On the issue of hardship, the commentary to the rule provides,

> [A] balancing is required between the interests of the client and those of the tribunal and the opposing party.  Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses.  Even if there is risk of such prejudice . . . due regard must be given to the effect of disqualification of a lawyer's client.  It is relevant

---

[12] Assuming that Wolfe can participate in pretrial litigation, his participation does not entitle him to have access to Vendio's confidential information.  As determined in the preceding protective order analysis, his access depends on his involvement in competitive decisionmaking.

that one or both parties could reasonably forsee that the lawyer would probably be a witness.

If an attorney is a necessary witness for a party, and the attorney is also an officer or stakeholder for that party, courts often find prejudice to the adverse party. One rationale is that counsel is more likely to be motivated by pecuniary interest than advocacy. *See Mt. Rushmore Broad., Inc. v. Statewide Collections*, 42 P.3d 478, 482 (Wyo. 2002); *Int'l Res. Ventures, Inc. v. Diamond Mining Co.*, 934 S.W.2d 218, 220-21 (Ark. 1996).

Regarding the countervailing weight to be given to the effects of disqualification, courts have not found adverse effects simply because the attorney is also an officer or stakeholder. *See McColloch v. Velez*, 364 F.3d 1, 4-5 (1st Cir. 2004); *Emerald Partners v. Berlin*, 564 A.2d 670, 680 (Del. Ch. 1989). If such a conflict is foreseeable, as the commentary suggests, then courts will ordinarily expect that a party retain outside counsel. *See Mt. Rushmore Broad., Inc.*, 42 P.3d at 482; *Int'l Res. Ventures, Inc.*, 934 S.W.2d at 221; *cf. Collins Entertainment, Inc. v. White*, 611 S.E.2d 262, 271 (S.C. Ct. App. 2005) (upholding district court order that counsel either proceed as attorney or fact witness).

Northbrook bases its allegations of hardship, in part, on the additional legal costs it will incur if Wolfe does not serve as its litigation counsel. Some courts suggest such costs may be a factor in determining hardship. *See D.J. Investment Group, L.L.C. v. Dae/Westbrook, L.L.C.*, 147 P.3d 414, 424 (Utah 2006); *cf. Sargent County Bank v. Wentworth*, 500 N.W.2d 862, 872 (N.D. 1993) (noting increased costs to replace counsel where litigation was ongoing for years); *McElroy v. Gaffney*, 529 A.2d 889, 893 (N.H. 1987) (plurality opinion) (similar).

A more common concern is whether a party will lose the knowledge and expertise that counsel has acquired throughout the litigation. So as the duration of litigation increases, there is an accordingly greater likelihood that disqualification of counsel will work hardship against the

client.  *See Carta ex rel. Estate of Carta v. Lumbermens Mut. Cas. Co.*, 419 F.Supp.2d 23, 31-32 (D.Mass. 2006); *Brown v. Daniel*, 180 F.R.D. 298, 302 (D.S.C. 1998).

### 4.      Conclusion

Because Wolfe has an interest in Northbrook's success in this litigation, his participation as both a witness and litigation counsel causes prejudice to Vendio.  This prejudice is weighed against the potential effects of disqualification.  Wolfe's evident status as the controlling member of Northbrook is immaterial.  Northbrook also had reason to foresee that Wolfe was a necessary witness—it admits as much—and he may be disqualified at this early stage of litigation without necessarily impairing Northbrook's preparation of its case.

What remains, therefore, are the additional attorney fees that Northbrook incurs in lieu of the services provided by Wolfe.  As noted beforehand in the protective order analysis, the record does not explain how this cost affects Northbrook or its ability to prosecute its claims.  *See infra* at p. 32 n. 8.  Nor is it evident, from authorities examining the rule, that such costs are enough to establish hardship.

Some significant ethical questions are presented by Wolfe's representation of Northbrook in this litigation, and this Court has an obligation to take note of them.  But it is not appropriate, at this time, to take action on these questions.  Pursuant to Local Rule 83.6(d)(1), it is suitable for Wolfe to receive notice and an opportunity to be heard.  This Court accordingly recommends that he be ordered to show cause why he not be disqualified from representation, for violation of Rule 3.7(a), and that the parties be given time for briefing on this matter.  *Cf. In re SuperGuide Corp.*, 18 Fed.Appx. 810, 812 (Fed. Cir. 2001).

### III.    CONCLUSION

Because Vendio does not have systematic and continuous contacts with Minnesota, it is not subject to general personal jurisdiction here.  Minimal contacts are established, however, by Minnesota residents who have downloaded and used Vendio's software.  Because Northbrook's patent infringement claims arise from the contacts, and because exercising personal jurisdiction comports with fairness and substantial justice, Vendio is subject to specific personal jurisdiction in Minnesota.

Although evidence and witnesses may be found in the Northern District of California, transfer of venue there does little more than shift costs of litigation from Vendio to Northbrook.  For this reason, Vendio does not overcome the presumption of venue in Northbrook's selected forum, and it is not appropriate to transfer venue.  This Court concludes that Vendio's motion to dismiss for lack of personal jurisdiction, or in the alternative to transfer venue, is appropriately denied.

As Wolfe is evidently the controlling member of Northbrook, and because he engages in its licensing activities, he is involved in competitive decisionmaking.  Notwithstanding the fact that Northbrook lacks the ability to market or manufacture its patented technologies, its interest in those technologies is enough to establish its competitive posture against other businesses in the field.  Under these circumstances, a protective order is appropriate, under which Vendio may withhold its confidential information from Wolfe.  Northbrook may challenge such withholding, however, on an appropriate showing of hardship.

Because Wolfe will be a necessary witness at trial, his continued participation as counsel for Northbrook raises significant ethical questions.  Under the circumstances, it is suitable that he show cause why he not be disqualified from his representation in this litigation.

**IV.    RECOMMENDATION**

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED THAT:**

1.     Vendio's motion to dismiss or in the alternative to transfer venue (Doc. No. 24)

be **DENIED.**

2.     Northbrook's motion to amend its complaint (Doc. No. 35) be **GRANTED.**

3.     Vendio's application for a protective order (Doc. No. 34) be **GRANTED.**

4.     No later than seven days after the order adopting this report, the Magistrate Judge

issue a protective order consistent with this report.

5.     No later than fourteen days after the order adopting this report, the parties meet

and confer to determine whether redactions in previously filed documents may be

sealed consistent with the protective order.

6.     No later than twenty-one days after the order adopting this report, the parties do

one or both of the following:

a.     File a stipulation and proposed order stating how redactions in previously

filed documents should be handled.

b.     File letter memoranda that, concisely and with particularity, explain the

parties' disputes on whether previously filed documents are subject to seal

under the protective order.

7.     Once the parties' submissions regarding the redacted documents are complete, the

Magistrate Judge shall take the matter under advisement without further hearing.

8.     No later than fourteen days after the order adopting this report, Mr. Wolfe shall

file a memorandum and affidavit and **SHOW CAUSE** why he not be disqualified

from representation for violation of Rule 3.7(a).   These submissions shall specifically address the legal questions raised in this report.

9.      No later than twenty-one days after the order adopting this report, the parties may file memoranda addressing any contentions raised by Mr. Wolfe.

10.     Once these submissions are complete, the District Judge determine if a hearing is appropriate, or whether this matter should be referred to the Magistrate Judge for further consideration.

Dated this 4th day of April, 2008.

s/ *Jeanne J. Graham*
JEANNE J. GRAHAM
United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **April 18, 2008**.  A party may respond to the objections within ten days after service thereof.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The district court judge shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.

**APPENDIX**

Exh. 1      Screen Shots [undated] (Decl. of J. Nichols, Feb. 15, 2008, Exhs. A, H) [Doc. No. 52].

Exh. 2      Decl. of R. Sales, Oct. 17, 2007 [Doc. No. 28].

Exh. 3      Contract, June 19, 2007 (Decl. of J. Nichols, Feb. 15, 2008, Exh. B) [Doc. No. 52].

Exh. 4      Contract, Mar. 1, 2007 (Decl. of J. Nichols, Feb. 15, 2008, Exh. C) [Doc. No. 52].

Exh. 5          Decl. of R. Sales, Feb. 25, 2008 [Doc. No. 40].

Exh. 6          Depo. of R. Sales, Feb. 4, 2008 (Decl. of J. Nichols, Feb. 15, 2008, Exh. G) [Doc. No. 52].

Exh. 7          Report [undated] ("Financial Figures and Analysis") (Decl. of J. Nichols, Feb. 15, 2008, Exh. F) [Doc. No. 52].

Exh. 8          Report [undated] ("Explanation of Estimation of Annual Minnesota Revenue from Auto-Search") (Decl. of J. Nichols, Feb. 15, 2008, Exh. F) [Doc. No. 52].

Exh. 9          Report [undated] ("Collections from Minnesota Customers") (Decl. of J. Nichols, Feb. 15, 2008, Exh. F) [Doc. No. 52].

Exh. 10         Decl. of M. Wolfe, Feb. 28, 2008 [Doc. No. 46].

Exh. 11         Decl. of P. Lancaster, Feb. 28, 2008 [Doc. No. 47].