UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

NORTHBROOK DIGITAL, LLC,                      Case No. 07-CV-2250 (PJS/JJG)

             Plaintiff,

v.                                            MEMORANDUM OPINION AND ORDER

VENDIO SERVICES, INC.,

             Defendant.

---

James K. Nichols and Peter M. Lancaster, DORSEY & WHITNEY LLP; Mark A. Wolfe, NORTHBROOK DIGITAL LLC, for plaintiff.

Felicia J. Boyd, Lee M. Pulju, and Elizabeth Cowan Wright, FAEGRE & BENSON LLP; Daniel Johnson, Jr. and Rita E. Tautkus, MORGAN, LEWIS & BOCKIUS LLP; Theodore F. Shiells, CARR LLP, for defendant.

Plaintiff Northbrook Digital, LLC ("Northbrook") brings suit for patent infringement against defendant Vendio Services, Inc. ("Vendio"). Northbrook is a one-man operation run by Mark A. Wolfe. Wolfe wears many hats: He is the named inventor of the patents in suit; he is an attorney licensed to practice before the United States Patent and Trademark Office ("PTO") and prosecutes his own patents (including the patents in suit and related continuation patents); he is the owner of Northbrook and a handful of other small entities; he plans to testify both as an expert witness and as a fact witness at trial; and he has entered an appearance as litigation counsel on behalf of Northbrook.

Vendio is a small company that makes software related to internet sales and advertising. Vendio's software product, Dealio, is a "toolbar" that integrates with web browsers such as Microsoft's Internet Explorer and Mozilla's Firefox. Dealio offers end users quick access to sales ("deals") offered by online merchants. Dealio is free for end users; Vendio makes its

money from online merchants, who pay Vendio commissions related to ads distributed and sales made through the Dealio software.

Three motions are now pending before the Court:  (1) Vendio's motion to dismiss for lack of personal jurisdiction and improper venue or, in the alternative, to transfer [Docket No. 24]; (2) Northbrook's motion to amend or correct its complaint [Docket No. 35]; and (3) Vendio's motion for a protective order [Docket No. 34].[1]  The Court referred Vendio's dispositive motion (the motion to dismiss or transfer) to Magistrate Judge Jeanne J. Graham for a report and recommendation ("R&R") under Rule 72(b)(1) of the Federal Rules of Civil Procedure.  Because the other two motions are nondispositive, they were assigned to Judge Graham to be heard in the first instance pursuant to Rule 72(a).  Judge Graham issued a lengthy and careful R&R addressing all three motions on April 4, 2008 [Docket No. 59].

Judge Graham recommends denying Vendio's motion to dismiss or transfer.  Vendio has not objected to this recommendation, and the Court therefore adopts it and denies Vendio's motion.  Judge Graham also recommends granting Northbrook's motion to amend or correct its complaint.  Again, Vendio has not objected to this recommendation, and the Court therefore adopts it and grants Northbrook's motion.

The remaining disputes relate to Vendio's motion for a protective order.  Vendio argues that, although Wolfe has entered an appearance as an attorney representing Northbrook, Wolfe should nevertheless be denied access to certain of Vendio's confidential information designated "Confidential — Attorneys' Eyes Only."  Vendio also argues that Wolfe's participation as a

---

[1]Vendio's request for a protective order was made in a letter dated February 21, 2008, which the Court will treat as a motion.

member of Northbrook's litigation team must be limited in light of the Minnesota Rules of Professional Conduct.

Judge Graham recommends granting Vendio's motion for a protective order and denying Wolfe access to Vendio's confidential documents unless Northbrook can demonstrate that Wolfe needs access to certain documents because he has "specialized knowledge about the patented technology" and his access is "essential to Northbrook's preparation of its case."  R&R at 33. Judge Graham also recommends that Northbrook be ordered to show cause why Wolfe should not be disqualified from representing Northbrook under Rule 3.7(a) of the Minnesota Rules of Professional Conduct, which generally forbids a lawyer from "act[ing] as advocate at a trial in which the lawyer is likely to be a necessary witness . . . ."  Minn. R. Prof. Conduct 3.7(a); R&R at 35-39.

Northbrook objects in part to the R&R.  Pl. Obj. R&R [Docket No. 61].  Northbrook registers its disagreement with Judge Graham's analysis of Rule 3.7(a) but "does not formally object" to that portion of the R&R.  *Id.* at 12 n.2.  Instead, Northbrook has addressed the concerns raised by Judge Graham over the conflict between Wolfe's role as litigation counsel and his role as a trial witness by agreeing to limit Wolfe's activities as litigation counsel. Specifically, Northbrook promises that Wolfe will not serve as Northbrook's trial counsel and "will not act as Northbrook's attorney in any pretrial proceedings, either."  *Id.* at 12.  Because the Court will hold Northbrook to its promise, Wolfe will not "act as advocate at a trial," and thus Wolfe's further participation in this litigation will not violate Rule 3.7(a).  The Court therefore finds that further briefing on this issue is unnecessary, and the Court declines to adopt the R&R

to the extent that it recommends that the Court order Northbrook to show cause why Wolfe should not be disqualified as litigation counsel.

Northbrook does strenuously object to Judge Graham's recommendation that a protective order be entered in this case under which Wolfe would be denied access to Vendio's confidential information designated "Confidential — Attorneys' Eyes Only."  The Court agrees with Judge Graham that Wolfe should not have unfettered access to all of Vendio's confidential information. But the Court's reasoning differs somewhat from Judge Graham's, as do the limitations that the Court finds to be appropriate under the circumstances.  The Court therefore adopts the R&R only in part, as will be described below.

Before turning to the merits, though, the Court must comment on a troubling aspect of Vendio's response to Northbrook's objection to the R&R.  Vendio's first response grossly exceeded the 3,500-word limit set forth in Local Rule 72.2.  Because the mistake was inadvertent and because Vendio promptly admitted its error, the Court permitted Vendio to file a substitute response.  Order May 6, 2008 [Docket No. 75].  Vendio promptly submitted such a response, and it certified that the response was 3,485 words long, just under the 3,500-word limit of Local Rule 72.2.  Cert. Compliance May 7, 2008 [Docket No. 76 Attachment 1].

In fact, though, Vendio violated the spirit, if not the letter, of Local Rule 72.2.  Vendio's certificate of compliance affirms that "[p]er the word count feature" of its word-processing program, its memorandum is 3,485 words long.  But to reduce the number of words counted by its word-processing program, Vendio hyphenated things that are never hyphenated:  Instead of "Docket 59," for instance, Vendio writes "Docket-59"; instead of "Nichols Decl." and "Tautkus Decl.," Vendio writes "Nichols-Decl." and "Tautkus-Decl."; instead of "Northbrook Obj.,"

Vendio writes "NB-Objection." The first two types of hyphens appear at least nineteen times in Vendio's substitute response. Thus, if Vendio had not manipulated the word-counting feature of its word-processing program through improper hyphenation, Vendio's word-processing program would have counted many more words, and Vendio would have once again violated the word limit imposed by Local Rule 72.2.[2]

This Court makes plenty of inadvertent errors itself, and thus this Court generally overlooks inadvertent errors, as it did with respect to Vendio's first violation of the rule. Had Vendio confined itself to using improper hyphenation in its substitute response, the Court might again have overlooked Vendio's conduct, even though this time the conduct was almost surely not inadvertent. But Vendio has cheated the word limit not only by using hyphens improperly, but by referring to Judge Graham, at least twenty times, simply as "Graham." The Court commends the practice of referring to *parties* and *witnesses* by last name only. *See* Bryan A. Garner, *The Winning Brief* 266 (2004) ("Generally, dispense with *Mr.*, *Mrs.*, and *Ms.*; use last names alone after the first mention of a *party's* or *witness's* name.") (emphasis added). But this Court cannot recall reading a motion, brief, or other paper — even from the most hapless of pro se litigants — that referred to a federal magistrate judge by her last name only. No one does this because it is disrespectful to the magistrate judge. Surely one of the six lawyers at the three

---

[2]Vendio's word count is also artificially low because Vendio has omitted from citations some spaces that the Bluebook calls for. *See* Def. Subst. Resp. at 2 [Docket No. 76] ("F.Supp.2d" should be "F. Supp. 2d"), 10 ("F.Supp." should be "F. Supp."), 11 ("D.Mass" should be "D. Mass."). These omissions are inconsistent enough that the Court presumes that they are inadvertent errors of citation format, which the Court normally overlooks. Other omissions of spaces seem more deliberate but could be simple mistakes. *See id.* at 6 ("S.Becker" and "P.Hunter" should be "S. Becker" and "P. Hunter"). In any event, omitting spaces is not an acceptable way to reduce a document's word count.

prestigious firms representing Vendio could have figured out a way to squeeze twenty words

from a 3,500-word memorandum without being disrespectful to Judge Graham.

The Court understands that Judge Graham's R&R raises complicated issues, but

Northbrook's counsel were able to address those issues in 3,500 words without playing games

with hyphens or being disrespectful to Judge Graham.  If Northbrook can properly *object* to an

R&R in 3,500 words, then surely Vendio can properly *respond* to that objection in 3,500 words.

Vendio's counsel — who now have two strikes against them — should take great care to comply

with both the spirit and letter of this Court's rules in the future.

## I.  LEGAL PRINCIPLES

### A.  Standard of Review

The only matter before the Court is Judge Graham's recommendation with respect to

Vendio's motion for a protective order.  Because a motion for a protective order is

nondispositive, this Court will modify or set aside those aspects of Judge Graham's R&R relating

to the protective order only to the extent that they are "clearly erroneous or . . . contrary to law."[3]

Fed. R. Civ. P. 72(a).

### B.  Protective Orders in Patent Cases

Rule 26(c)(1) of the Federal Rules of Civil Procedure governs protective orders in civil

cases and provides:  "The court may, for good cause, issue an order to protect a party or person

from annoyance, embarrassment, oppression, or undue burden or expense . . . ."  Fed. R. Civ.

---

[3]Judge Graham could have issued an order on Vendio's motion for a protective order but instead issued an R&R because she considered the protective-order motion in connection with Vendio's motion to dismiss.  The Court reviews the portion of the R&R that relates to the protective-order motion as if it were an order on that motion.

P. 26(c)(1).  The party seeking the order — in this case, Vendio — bears the burden of establishing the requisite "good cause."

Protective orders are a common feature of patent cases because the parties are often competitors who understandably are reluctant to disclose trade secrets and other confidential information to each other (and to the public).  The basic principles governing protective orders in patent cases derive from the Federal Circuit's opinion in *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984).  *U.S. Steel* itself dealt with the narrow question of whether in-house counsel for one party should be always be excluded from access to an opposing party's confidential documents.  *Id.* at 1467.  *U.S. Steel* rejected any such categorical rule, holding that "access by retained as well as in-house counsel should be governed by the facts . . . ."  *Id.* at 1468-69.  In reaching this holding, the Federal Circuit said:  "In a particular case, *e.g.*, where in-house counsel are involved in competitive decisionmaking, it may well be that a party seeking access should be forced to retain outside counsel or be denied the access recognized as needed."  *Id.* at 1468.  Further, *U.S. Steel* held that in gauging whether allowing one party's lawyers access to its opponent's confidential information would create an unacceptable risk that the confidential information would be inadvertently disclosed, the risk must be assessed "on a counsel-by-counsel basis . . . ."  *Id.*

These principles have subsequently been applied in numerous patent cases.  Not surprisingly, given the fact-intensive nature of the *U.S. Steel* analysis and the fact that discovery issues are largely within the discretion of district courts, cases with apparently similar facts often come out differently.

Nonetheless, certain themes recur.  First, the key issue in many cases is whether the litigants are direct competitors and whether the people who would be denied access to information under a protective order are involved in a party's competitive decisionmaking. Second, some courts distinguish between financial information and technical information, because the two types of information do not necessarily raise the same concerns.  And third, courts differ over the extent to which involvement in patent prosecution is treated as competitive activity for protective-order purposes.

All three themes are present in *Safe Flight Instrument Corp. v. Sundstrand Data Control Inc.*, an oft-cited case from the District of Delaware (a district with a significant patent docket). 682 F. Supp. 20 (D. Del. 1988).  The defendant, Sundstrand, sought a protective order forbidding plaintiff Safe Flight's founder, Leonard M. Greene, from seeing Sundstrand's confidential documents.  Greene was "a preeminent aeronautic engineer, having received more than sixty aeronautic patents."  *Id.* at 21.  The court granted the protective order, finding that such access would pose a competitive threat because "Greene actively plies aeronautic engineering" and the two companies "directly compete in the market for avionics equipment . . . ."  *Id.*  After citing numerous cases supporting the proposition that "proper safeguards should attend the disclosure of trade secrets," the court went on to say that "[t]his line of precedent implicitly recognizes that courts often afford fuller protection to technological information than that extended to ordinary business information."  *Id.* at 22.  The court did, however, allow Safe Flight's in-house counsel to have access to Sundstrand's confidential technical information, finding that the in-house lawyers would be "segregated" by Safe Flight to minimize the risk that Safe Flight would misuse

the information.  *Id.* at 23.  The court also noted that the in-house lawyers, unlike Greene, were

officers of the court who were bound by a code of professional responsibility.  *Id.*

But at times even in-house lawyers have been denied access to an opposing party's

technical information.  In *Brown Bag Software v. Symantec Corp.*, a case involving alleged

copyright infringement of software code, the Ninth Circuit affirmed a district court's protective

order denying the plaintiff's in-house counsel access to defendant Symantec's trade secrets,

which included source code and information about development of the allegedly infringing

software.  960 F.2d 1465, 1471 (9th Cir. 1992).  In *Vardon Golf Co. v. BBMG Golf, Ltd.*, the

district court affirmed a magistrate judge's protective order forbidding access to a defendant's

confidential information by Vardon Golf's sole employee, a one-man band who (like Wolfe) was

his company's president, engineer, patent attorney, and trial counsel.  No. 91-C-0349, 1991 WL

222258, at *2 (N.D. Ill. Oct. 24, 1991).  Similarly, in *IP Innovation L.L.C. v. Thomson, Inc.*, the

plaintiff's principal, an inventor with several issued and pending patents, was forbidden from

having access to the defendant's confidential information for reasons like those given in *Safe*

*Flight*.  No. 1:03-CV-0216, 2004 WL 771233, at *3 (S.D. Ind. Apr. 8, 2004).

Other courts have granted protective orders directed at a party's outside patent-

prosecution lawyers.  In *Motorola, Inc. v. Interdigital Technology Corp.*, the court granted a

protective order with respect to a law firm that was the defendant's trial counsel and that, during

the course of the suit, became its patent-prosecution counsel.  No. 93-488-LON, 1994 WL

16189689 (D. Del. Dec. 19, 1994).  The firm, Dickstein, Shapiro & Morin, was defendant

Interdigital's patent-prosecution counsel for at least four patent applications that were

continuations or divisional applications of the patents in suit.  *Id.* at *1.  The court held:

> [T]he [Dickstein, Shapiro & Morin] attorneys who have received confidential information from Motorola under the protective order shall not prosecute any [Interdigital] patent applications relating to the broad subject matter of the patents in suit during the pendency of this case and until one year after the conclusion of the present litigation, including appeals.

*Id.* at *3.

Where a party's outside patent-prosecution firm has not yet had access to the other party's confidential information, the firm may be prospectively forbidden from having such access.  In *Mikohn Gaming Corp. v. Acres Gaming Inc.*, a magistrate judge granted a protective order forbidding one of two firms that had entered an appearance as defendant Acres's trial counsel from (1) having access to plaintiff Mikohn's "sensitive technical information . . . such as software codes and hardware electrical designs" and (2) attending depositions.  50 U.S.P.Q.2d 1783, 1784 (D. Nev. 1998).  The firm, called "the Marger firm" by the court, was prosecuting patent applications for Acres that were "the very subject matter" of the suit at the same time that it had entered an appearance as trial counsel.  *Id.*  In granting Mikohn's motion for a protective order, the court rejected Acres's argument that because Acres "would not be allowed to amend claims or add new claims regarding matters that were not already disclosed in its original patent application," the Marger firm's patent-prosecution activities were not a competitive threat to Mikohn.  *Id.* at 1785.  Instead, the court found that the Marger firm was "prosecuting patent applications that are . . . part of the very core of this suit" and therefore "in light of the claims made in this lawsuit, the advice rendered by the Marger firm is intensely competitive."  *Id.*  A similar result was reached by the court in *In re Papst Licensing, GmbH, Patent Litigation*, in which the court held:

> [I]t is clear that the advice and participation of the Papst parties'
> counsel in preparation and prosecution of patent applications
> related to the patents in suit is an intensely competitive
> decisionmaking activity and would be informed by access to the
> Non-Papst parties['] confidential information.  Counsel's ability to
> file new claims in existing and pending patents based on the
> confidential information discovered during the course of this
> litigation poses an unacceptable opportunity for inadvertent
> disclosure and misuse.  Although the Court is confident that
> counsel for the Papst parties maintains the highest ethical and
> professional standards, the risk of inadvertent disclosure and
> misuse and the difficulty of distinguishing the source of the Papst
> parties' basis for filing new claims are great.

No. MDL 1278, 2000 WL 554219, at *4 (E.D. La. May 4, 2000).

Protective orders issued by this Court in other patent cases have likewise recognized that attorneys who are directly involved in patent prosecution may be subject to greater restrictions than other attorneys.  In *Medtronic, Inc. v. Guidant Corp.*, Magistrate Judge Jonathan G. Lebedoff recognized that "prosecuting patents is distinct from other legal duties and presents unique opportunities for inadvertent disclosure."  Nos. Civ. 00-1473 & Civ. 00-2503, 2001 WL 34784493, at *4 (D. Minn. Dec. 20, 2001).  He therefore granted a protective order that prohibited disseminating certain confidential information to attorneys who, during the suit or in the year following its conclusion, "actually draft patent applications, claim language for patent applications, or arguments made in support of patent applications related to the treatment of abnormal cardiac rhythms."  *Id.* at *5.  Judge Lebedoff did, however, permit attorneys who only *supervised* patent prosecution activities to have access to the disputed confidential information. *Id.*

This is not to say that courts have universally prohibited lawyers and inventors involved in patent prosecution from having access to opposing parties' confidential information.  In

particular, in *Avocent Redmond Corp.* v. *Rose Electronics, Inc.,* the court refused to bar plaintiff

Avocent's patent prosecutors from having access to defendant Rose Electronics' technical

information, holding that "[d]efendants have not offered any evidence that suggests that . . .

Avocent's patent prosecutors advise Avocent in its 'competitive decisionmaking.'"  242 F.R.D.

574, 579 (W.D. Wash. 2007).  Similarly, in *AFP Advanced Food Products LLC* v. *Snyder's of*

*Hanover Manufacturing, Inc.*, the court rejected defendant Snyder's motion for a protective order

that would have prohibited plaintiff AFP's patent prosecutors from having access to Snyder's

confidential information.  No. Civ. A. 05-3006, 2006 WL 47374 (E.D. Pa. Jan. 6, 2006).  The

order sought by Snyder and denied by the court resembled the order *granted* by Judge Lebedoff

in *Medtronic:*  Snyder wanted to forbid any of AFP's lawyers who were given access to Snyder's

confidential information from prosecuting patents during the course of the suit or for two years

afterwards.  *Id.* at *2.  The court held that Snyder had not presented particularized evidence of the

need for such an order.  *Id.*

    *Avocent* and *AFP Food Products* represent a minority view, however.  As discussed

above, many courts recognize that patent prosecution can pose the type of competitive threat that

justifies a protective order.  And cases other than *Avocent* and *AFP Food Products* that have held

that lawyers or inventors involved in a party's patent-prosecution activities could have access to

the other party's confidential information tend to involve unusual factual situations.  For

instance, in *Medtronic Sofamor Danek, Inc. v. Michelson*, the defendant inventor, Michelson,

was allowed access to plaintiff Medtronic's confidential information.  No. 01-2373-GV, 2002

WL 33003691 (W.D. Tenn. Jan. 30, 2002).  *Medtronic Sofamor Danek* was unusual in two

respects:  First, the protective-order dispute was over whether Michelson could have access to the

technical information of *his licensee*, Medtronic.  *Id.* at *3 ("Medtronic initiated this lawsuit, seeking a court to declare that patents and methods designed by none other than Dr. Michelson now belong to it pursuant to the various agreements in dispute.").  Second, Medtronic had voluntarily given Michelson access to its confidential information in earlier cases in which he had served as an expert for Medtronic.  *Id.*  In a different case, *Trading Technologies International, Inc. v. eSpeed, Inc.,* the court refused to restrict the patent-prosecution activities of a plaintiff's attorney who had access to confidential information, but the court found that the attorney was "primarily a litigator" who was only "incidentally involved in patent applications . . . ."  No. 04-C-5312, 2004 WL 2534389 (N.D. Ill. Sept. 24, 2004).

Finally, as noted at the outset, when litigants compete in output markets — i.e., when they sell similar products to similar customers — courts routinely grant protective orders forbidding access to confidential information by people, including attorneys, who are involved in competitive decisionmaking apart from patent prosecution.  *See, e.g., Highway Equip. Co. v. Cives Corp.,* No. C04-0147, 2007 WL 1612225 (N.D. Iowa May 15, 2007); *Probatter Sports, LLC v. Joyner Techs., Inc.,* No. 05-CV-2045, 2006 U.S. Dist. LEXIS 74219 (N.D. Iowa Oct. 11, 2006); *Intel Corp. v. Via Techs., Inc.,* 198 F.R.D. 525 (N.D. Cal. 2000).

## II.  ANALYSIS

### A.  Competition in Output Markets

Generally, competitors in the business world compete in output markets for customers: Coca-Cola competes with Pepsi; McDonald's competes with Burger King; Toyota competes with General Motors.  Northbrook, however, does not compete with Vendio for customers, because the two companies are in different businesses.

Northbrook, to the extent that it sells anything, sells the right to use its patented technology — i.e., it sells patent licenses. Vendio, for its part, sells advertising and marketing services. As far as the record shows, Northbrook sells nothing except patent licenses. It does not sell advertising or marketing services, or know-how, or anything else. Similarly, as far as the record shows, Vendio sells nothing except advertising and marketing services. It does not sell licenses to *its* technology, or know-how, or anything else. Northbrook and Vendio thus sell entirely different products to entirely different customers.[4]

Judge Graham nevertheless found that, because Northbrook and Vendio have a "shared interest in a single patented technology," they are competitors. R&R at 28; Pl. Obj. R&R at 6. Northbrook objects to this finding, arguing that such a definition of competition is too broad "because patent litigants *always* have a shared interest in the relevant patented technology . . . ." Pl. Obj. R&R at 6. The Court agrees with Northbrook that the notion of "competition" underlying the R&R is too broad. The R&R is clearly erroneous because it is based on the assumption that Wolfe (as Northbrook's principal) should not have access to Vendio's financial and customer data because Northbrook, as a result of its licensing activity, competes with Vendio in output markets. As described above, that is just not true.

This is not to say that Northbrook has no interest in Vendio's business. Northbrook does have an interest, but its interest is as a supplier of inputs to Vendio, and not as a competitor. If Vendio is indeed infringing Northbrook's patents, then Vendio is using inputs (intellectual

---

[4]Because Northbrook sells nothing to Vendio's customers, and Vendio sells nothing to Northbrook's customers (to the extent that they exist), this case is significantly different from *Intel Corp.* v. *Via Techs., Inc.,* 198 F.R.D. 525 (N.D. Cal. 2000). The parties in *Intel* were direct competitors in the output market for computer chips and were also competitors in the market for licenses to computer-chip-related intellectual property. *Id.* at 529-30.

property) that do not belong to it, and Northbrook has a right to be compensated for (or to stop) Vendio's use of Northbrook's resources.  Suppose, for example, that Northbrook owned a gold mine, and Vendio was a retail jeweler that was secretly stealing ore from the mine and turning it into rings.  Northbrook and Vendio would not be competitors in any output market, because Vendio would not sell ore, and Northbrook would not sell jewelry.  Northbrook would have an interest in Vendio's business, but not as a competitor.

It is true, as Judge Graham notes, that the value of what Northbrook sells — licenses to its patents — is a function of the value of the business of a potential licensee such as Vendio. R&R at 27.  But this is not a reason to prevent Northbrook from learning about Vendio's costs, customers, or profitability.  Northbrook cannot steal Vendio's customers, because Northbrook does not sell anything to Vendio's customers.  At most, Northbrook can use information about Vendio's costs, customers, or profitability to determine what price it should charge Vendio for a license to its patents.  In the context of patent litigation, however, determining what price to charge an accused infringer for a patent license is equivalent to assessing the value of the case itself.  And every litigant in every case seeks to assess the value of its case:  Defendants want to estimate their potential liability, and plaintiffs want to estimate their potential recovery.

In commercial cases between competitors, it makes sense to restrict each competitor's direct access to the other's customer and financial data, because one competitor could use its opponent's information to compete unfairly in the marketplace.  Case valuation in such cases must be done by outside attorneys and experts, who can report estimated damages figures to their clients.  Those clients, in turn, can use that information in determining whether (and on what terms) to settle the litigation.

-15-

But in a case such as this — a case brought by a supplier of inputs (Northbrook) against an alleged consumer of those inputs (Vendio) — there is no reason to prevent the supplier from having access to the consumer's financial or customer data.  Northbrook alleges that Vendio is infringing its patents.  Until Vendio wins the case on the merits, Northbrook must assess the value of its case, as must any litigant.  There is no reason why Northbrook, through Wolfe, should have to rely solely on outside attorneys and retained experts to assess the portion of the case's valuation that turns on Vendio's financial and customer information.  Northbrook cannot use that information to compete unfairly with Vendio for Vendio's customers because Northbrook does not serve those customers.  Northbrook can only use Vendio's financial and customer information to determine what to charge for a license, i.e., to determine the settlement value of this case.  That is an entirely legitimate use of the information.

*B.  Competition in Input Markets*

As noted above, Northbrook is more like a supplier to Vendio than a competitor, because Northbrook and Vendio do not compete in the same output market (i.e., the market for internet advertising and marketing services).  But there is a very limited sense in which Vendio and Northbrook compete in the *input market* of intellectual property used for internet advertising and marketing.

Vendio uses certain software products and business methods to run its business; those products and methods are the inputs that Vendio transforms into a service that it sells to advertisers and marketers.  Vendio, like any business, must decide whether to make or buy its inputs.  When a business chooses to buy an input that it used to make, we call it "outsourcing";

when a business chooses to make an input that it used to buy, we call it "vertical integration" (or taking an operation "in house").

Suppose that there were two different ways that Vendio could deliver its service:  (1) by using methods covered by Northbrook's patents; and (2) by using confidential methods developed in-house by Vendio and *not* covered by Northbrook's patents.  If Vendio chose approach (2), it would be in effect choosing to make an input in house rather than to buy the input from Northbrook.  Vendio would thus be competing with Northbrook in the input market for software products and business methods — Vendio would be both the maker and the consumer of those inputs.  This would be very limited competition, however, over a single customer — Vendio.  Because Vendio does not itself license its technology, Vendio and Northbrook do not compete in the broader market for intellectual property.

Now suppose that Vendio's confidential software and business methods are not covered by the claims of the asserted patents, but *could* be covered by claims in patents issued to Northbrook in the future if Northbrook knew enough about Vendio's operations  to draft claims to cover Vendio's software and methods.  If that happened, Vendio would no longer be able to choose to make its inputs.  Rather, Vendio would have to buy the inputs from Northbrook (because, by hypothesis, Northbrook would have patented them).  Vendio would be eliminated as Northbrook's competitor in the single-customer (Vendio) input market for the software and business methods underlying Vendio's business.  Moreover, this elimination of Vendio would be

unfair, because (again, by hypothesis) it would have been possible only because Northbrook had access to Vendio's confidential software and business methods.[5]

Vendio asks for a protective order in part to prevent Wolfe from gaining access to Vendio's confidential technical information and using that information in the course of patent prosecution.  *See* Def. Letter Mot. [Docket No. 34] at 3 ("Granting Mr. Wolfe access to Vendio's on-going research and development . . . would allow Northbrook to alter its technology development.  It would also facilitate amending claims in pending applications by Mr. Wolfe to mirror Vendio's technology.").  This is a legitimate basis for preventing Wolfe from having access to Vendio's technical information.  Vendio and Northbrook compete, in a limited way, in the input market for software and business methods to facilitate online advertising and marketing, and Vendio has a legitimate interest in preventing Northbrook from competing unfairly in that market by drawing patent claims more precisely to Vendio's methods than Northbrook would be able to do without access to Vendio's confidential technical information.

Judge Graham discounted this rationale, however, because she found that "Northbrook is not currently engaged in patent prosecution . . . ."  R&R at 27.  The Court agrees with Vendio that this factual finding is clearly erroneous.  *See* Def. Subst. Resp. at 6-8 [Docket No. 76].

Judge Graham's error is, however, understandable in light of how Wolfe and Northbrook's outside counsel characterized Wolfe's patent-prosecution activities.  Wolfe

---

[5]The analysis would be essentially the same if, through this litigation, Northbrook learned enough about Vendio's operations to draft claims that *arguably* covered Vendio's software and methods.  Vendio would then be vulnerable to threats of potentially ruinous patent-infringement litigation.  While Vendio would not *have* to purchase a license from Northbrook to continue operations, Vendio would feel added pressure to do so to avoid the risks and costs of litigation.  Vendio would *not* feel such added pressure if Northbrook had not been able to draft its claims with an eye toward Vendio's software and methods.

submitted a declaration that misleadingly minimizes the scope of his activities before the PTO. Wolfe says that all of his pending patent applications "are simply continuations of the original applications filed years ago," that they "do not disclose any new or recently-developed subject matter," and that he is not undertaking "development of new technology relating to defendant's business . . . ."  Wolfe Decl. ¶ 10 [Docket No. 46].  Further, Wolfe says that he "no longer devote[s] time to developing and implementing new ideas, products, and/or inventions relating to the patents in suit, relating to anything remotely relevant to defendant's business, or even relating to the consumer Internet in general."  *Id.* ¶ 8.  Northbrook's outside counsel amplifies Wolfe's argument, saying that "because federal law forbids introducing 'new matter' into a continuing application," it is "an impossibility" for Wolfe to "take Vendio's confidential information and add it to a continuing patent application, or otherwise alter Northbrook's 'technology development.'"  Pl. Mem. re Prot. Order at 10 [Docket No. 45].

It is, of course, literally true that a continuation application cannot introduce "new matter" to a patent application in the sense that it cannot claim anything not disclosed in the original application from which the continuation application stems.  Donald S. Chisum, 4A *Chisum on Patents* § 13.03[2] ("A continuation application is a second application that contains the same disclosure as the original application.  It may not contain anything that would be considered 'new matter' if inserted in the original application.").  But a continuation application can include *new claims*, as long as the claims are supported by the disclosure in the parent application.  *See* R. Carl Moy, 1 *Moy's Walker on Patents* § 3:54 at 3-165 (4th ed. 2007) ("The modern continuation practice can thus be taken as providing the applicant with essentially the same degree of freedom to obtain claims in the continuation that he or she enjoyed in the parent.").

-19-

And if the claims in the parent application claimed only a portion of what the specification discloses, then the new claims will broaden the effective reach of the patent even if they do not introduce "new matter." *See, e.g.*, *Central Sprinkler Co. v. Grinnell Corp.*, 897 F. Supp. 225, 227 (E.D. Pa. 1995) ("A continuing application is one that makes explicit a claim that was inherent in a previously filed application.  It contains no new information.")  By emphasizing that Wolfe cannot introduce "new matter" in his continuation claims, Wolfe and Northbrook's counsel understate the scope and significance of his vigorous continuation practice.[6]

Further, by saying that he is not devoting time to "developing and implementing new ideas, products, and/or inventions relating to the patents in suit," Wolfe creates a misleading impression that he is not currently engaged in any significant activities before the PTO that are related to the patents in suit.  Wolfe Aff. ¶ 8.  Wolfe's statement is literally true if one focuses on the words "*new* ideas, products, and/or inventions" and assumes that, although a continuation application can include new *claims*, it cannot include "new ideas, products, and/or inventions" because those would be "new matter" unsupported by the specification.  But a claim itself is an idea — a *specific* idea about how to describe the general invention disclosed in a patent's specification.

In fact, it is apparent from the record that Wolfe, in his continuation practice before the PTO, *is* devoting significant time to securing new *claims* related to the patents-in-suit.  In connection with its motion for a protective order, Vendio submitted three published patent

---

[6]In connection with protective orders, other courts have rejected the argument that certain patent-prosecution activities pose no competitive threat because the patentee cannot introduce new matter — the very argument that Northbrook advances here.  *See In re Papst Licensing, GmbH, Patent Litigation*, No. MDL 1278, 2000 WL 554219, at *4 (E.D. La. May 4, 2000); *Mikohn Gaming Corp. v. Acres Gaming Inc.*, 50 U.S.P.Q.2d 1783, 1785 (D. Nev. 1998).

applications by Wolfe that are currently pending before the PTO.  Def. Letter Mot. Exs. B-D.

One of these, application number 11/552,519, was filed in October 2006 as a continuation of a

different application filed in September 2006.  *Id.* Ex. C.  A second of these, application number

11/624,817, was filed in January 2007 as a continuation of a different application filed in May

2006.  It is apparent from these two applications alone — which date back to applications filed in

the mid-1990s — that Wolfe's current practice before the PTO is not nearly as limited as he and

Northbrook's counsel imply.

A fuller picture of the scope of Wolfe's activities before the PTO emerges from the

materials submitted by Vendio in response to Northbrook's objection to the R&R.  Public

records show that Wolfe has a total of *fifteen* patent applications related to the patents in suit

currently pending before the PTO.  *See* Tautkus Decl. Exs. F-L & V [Docket No. 77].  Of these

fifteen applications, at least seven were filed *after* Northbrook filed this suit.[7]

When a plaintiff in a patent case is involved in prosecuting patents that are related to the

defendant's business, federal courts routinely limit the plaintiff's access to the defendant's

technical trade secrets.[8]  Here, Wolfe is actively involved in prosecuting patent applications that

---

[7]Vendio asserts that Wolfe has twenty-five pending continuation applications, of which
thirteen were filed after Northbrook filed this suit.  Def. Subst. Resp. at 7.  For two reasons, these
numbers appear to be inflated.  First, Vendio seems to be double-counting certain applications.
For instance, application number 11/735,423, filed on April 13, 2007, is a single application that
happens to be related to two issued patents; Vendio has counted that single application twice,
once for each patent that it relates to.  *See* Tautkus Decl. Ex. V.  Second, Vendio is counting
applications filed in April 2007 among the set of applications filed after this suit began, even
though Northbrook's complaint is dated May 9, 2007.

[8]*See IP Innovation L.L.C. v. Thomson, Inc.*, No. 1:03-CV-0216, 2004 WL 771233, at *3
(S.D. Ind. Apr. 8, 2004)*; Mikohn Gaming Corp. v. Acres Gaming Inc.*, 50 U.S.P.Q.2d 1783, 1784
(D. Nev. 1998); *Motorola, Inc. v. Interdigital Tech. Corp.*, No. 93-488-LON, 1994 WL

(continued...)

relate to Vendio's business and to the patents in suit.  This analysis is not changed by the fact that Wolfe is currently prosecuting continuation applications rather than original applications. Indeed, the vigorous scope of Wolfe's continuation practice, which has been going on for over a decade and which has resulted in multiple different patents that relate back to the same original applications, belies any suggestion that his practice is insignificant and could not result in patents with *new claims* that relate to Vendio's business.

Accordingly, Wolfe's activities before the PTO in prosecuting continuation applications related to the patents in suit are not compatible with allowing him to review, either as an attorney or as an expert witness, Vendio's confidential technical information.  The Court therefore grants Vendio's application for a protective order with respect to Vendio's confidential technical information.[9]

Northbrook contends that denying Wolfe access to Vendio's technical information will work a great hardship upon it.  The Court finds that, based on the record so far, the competitive threat to Vendio posed by Wolfe's access to Vendio's confidential technical information substantially exceeds the hardship to Northbrook from limiting that access.

That said, the Court agrees with Judge Graham that Northbrook is entitled to try to show, with respect to specific information provided by Vendio, that the hardship imposed on Northbrook by denying access to Wolfe outweighs the competitive threat to Vendio that would

---

[8](...continued)
16189689, at *3 (D. Del. Dec. 19, 1994); *Vardon Golf Co. v. BBMG Golf, Ltd.*, No. 91-C-0349, 1991 WL 222258, at *2 (N.D. Ill. Oct. 24, 1991).

[9]Although it should go without saying, the Court emphasizes that it is protecting only technical information that is both (1) Vendio's and (2) confidential.  It is not protecting just *any* technical information produced by Vendio.

result from such access.  The Court also agrees with Judge Graham that Northbrook will need to make a significant showing of need to meet this standard.  Contrary to Northbrook's assertion, Judge Graham did not clearly err in placing a heavy burden on Northbrook to justify Wolfe's access to Vendio's confidential information.  Rather, that heavy burden recognizes that Vendio has already established that giving Wolfe access to Vendio's confidential information poses a significant competitive risk.  Put another way, whether to give Wolfe access to Vendio's information depends on the result of a balancing test — but Vendio has already established that the potential competitive harm weighs heavily on one side of the balance.

In short, given that Wolfe is extremely active in prosecuting multiple continuation applications related to technology at issue in this suit, Northbrook will have to make a strong showing that Wolfe requires access to Vendio's confidential technical information before such access will be allowed by the Court.[10]  Requests for such access must be particularized and must be made to Judge Graham.  Given that technical experts other than Wolfe can readily assess whether Vendio is infringing Wolfe's patents — the function of a patent, after all, is to put the public on notice of what is patented — the Court anticipates that Northbrook will have great difficulty making the requisite strong showing.

---

[10]Northbrook asserts:  "There is nothing unique about Mr. Wolfe's role in this litigation. In-house counsel are commonly listed as counsel of record in patent cases."  Pl. Obj. R&R at 10. This is not entirely true — the in-house lawyers who appear as counsel of record in patent cases are not usually involved, as Wolfe is, in patent prosecution.  *See, e.g.*, *3M Co. v. Reflexite Corp.*, Civil No. 02-1251, Order on Prot. Order at 4 (D. Minn. Aug. 21, 2003) ("The risk of inadvertent disclosure is minimal because [3M's in-house lawyers] are not involved in competitive decisionmaking at 3M. . . . In fact, all three work solely in litigation for 3M Innovative Properties Company, rather than 3M Company itself.  *None of them prepare or prosecute patent applications* for 3M.") (attached as Ex. Q to Nichols Decl.[Docket No. 64]) (emphasis added).

*C.  Terms of Protective Order*

Northbrook asks the Court to enter the district's standard protective order in patent cases, Form 5 of the Local Rules.  Pl. Obj. R&R at 14.  For its part, Vendio says that "[a]t all times Vendio has been willing to use this District's Form 5 protective order, with the understanding that Wolfe would not be permitted to access Vendio's confidential information."  Def. Subst. Resp. at 11.

Northbrook accuses Vendio of having changed its position with respect to adopting the district's standard protective order, and says that this change suggests "Vendio's strategic motivation . . . ."  Pl. Obj. R&R at 11.  In fact, contrary to Northbrook's assertion, Vendio has never really changed its position on this issue.  That Vendio *seems* to have done so demonstrates only that Form 5 is inartfully drafted, not that Vendio's motivations are suspect.

Paragraph 4 of Form 5 creates, for protective-order purposes, up to seven categories of people, labeled (a) through (g).  Optional category (e) includes specified "inside counsel"; optional category (f) includes specified parties' employees other than inside counsel.  Mandatory category (b) includes "Attorneys and their office associates, legal assistants, and stenographic and clerical employees"; the word "Attorneys" is defined in Paragraph 1 as "counsel of record."  Under Paragraph 5 of Form 5, documents designated as "Confidential — Attorneys' Eyes Only" may not be disclosed to parties' *employees* (people in category (f)) but may be disclosed both to people in category (b) — i.e., "Attorneys" and their staff — and to "inside counsel" listed (if any are) in category (e).

On the most natural reading of Paragraph 4 itself, the class of "Attorneys" in category (b) would not include inside counsel, since there is a separate category — category (e) — that covers

only inside counsel.  This is apparently how Vendio's out-of-town counsel read Paragraph 4, and thus they were willing to adopt Form 5, since Wolfe is Northbrook's inside counsel and (on this reading) would *not* be one of the "attorneys" in category (b).  *See* Tautkus Decl. Ex. Q at 3. Northbrook's counsel interpret the form differently and think that "Attorneys" in category (b) means "outside attorneys plus any inside attorneys who are counsel of record."  *See id.* at 2.

Northbrook's counsel's interpretation is an unnatural reading of Paragraph 4 standing alone, but it is defensible because the term "Attorneys" is defined in Paragraph 1 as "counsel of record."  This means that inside counsel can join the class of attorneys entitled to see material designated "Confidential — Attorneys' Eyes Only" in one of two ways: either (1) by entering an appearance as counsel of record, or (2) by having themselves listed in category (e) of Form 5. There is no logical reason for Form 5 to provide these two different methods when the second one is entirely sufficient.[11]

For purposes of *this* case, the Court will enter a protective order based on Form 5 with modifications consistent with this opinion.  First, the term "Attorneys" will be defined as "counsel of record, excluding Mark A. Wolfe."  Second, because of the limited nature of the competition between Vendio and Northbrook, Vendio's in-house lawyers as a group will be designated as "inside counsel" under category (e) and will therefore have access to Northbrook's "Confidential" and "Confidential — Attorneys' Eyes Only" documents.  Third, Wolfe will be designated as a Northbrook employee and included in category (f) as someone with access to

---

[11]Indeed, this interpretation of Paragraph 4 effectively allows either party to unilaterally modify the protective order.  Even if certain inside counsel have been specified in category (e) by stipulation, a party can authorize additional in-house lawyers not listed in category (e) to see the other side's "Confidential — Attorneys' Eyes Only" information by simply having those additional lawyers enter an appearance as counsel of record.

"Confidential" documents but not "Confidential — Attorneys' Eyes Only" documents.  Fourth,

Paragraph 5 of Form 5 will be modified to permit the parties to designate *technical information*

*only* as "Confidential — Attorneys' Eyes Only."  By default, Wolfe will not be permitted access

to such information.  He can gain access to that information only by making a sufficient showing

of necessity, as described above.[12]

ORDER

Based on the foregoing and on all of the files, records, and proceedings herein, the Court

OVERRULES IN PART Northbrook's objection [Docket No. 61] and ADOPTS IN PART Judge

Graham's Report and Recommendation [Docket No. 59] to the extent that it is consistent with

this Memorandum Opinion and Order.  Accordingly, IT IS HEREBY ORDERED THAT:

1.  Defendant Vendio Services, Inc.'s motion to dismiss or transfer [Docket No. 24] is DENIED.

2.  Plaintiff Northbrook Digital, LLC's motion to amend or correct its complaint [Docket No. 35] is GRANTED.

3.  Defendant Vendio Services, Inc.'s motion for a protective order [Docket No. 34] is GRANTED as follows:  The Court will enter a protective order patterned on the district's standard order for patent cases but modified in accordance with this memorandum opinion and order.

Dated:  June  9 , 2008                           s/Patrick J. Schiltz
                                                 Patrick J. Schiltz
                                                 United States District Judge

---

[12]Of course, the parties can stipulate to a modification of the protective order at any time.